IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA, and ) 
THE STATE OF WEST VIRGINIA, )
 )
    Plaintiffs, )
 )
    v. )   CIVIL ACTION NO.:  3:18-cv-1003
 )
FELMAN PRODUCTION, LLC )
 )
    Defendant. )
 )

## JOINT COMPLAINT

Plaintiffs, the United States of America, by authority of the Attorney General of the United States, on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of West Virginia, on behalf of the West Virginia Department of Environmental Protection ("WV DEP"), through the undersigned attorneys, allege:

### NATURE OF ACTION

1. This is a civil action brought against Defendant Felman Production, LLC ("Defendant") pursuant to Section 113(b) of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7413(b) for injunctive relief and the assessment of civil penalties for violations of Title V of the CAA, 42 U.S.C. §§ 7661 to 7661f, the emission standards promulgated pursuant to Section 112 of the CAA, 42 U.S.C. § 7412 codified at 40 C.F.R. Part 63, Subpart XXX, and the federally-approved West Virginia State Implementation Plan, including regulations codified under Title 45, Series 7 of the West Virginia Code of State Regulations, under the authority of

Section 110 of the Clean Air Act, 42 U.S.C. § 7410, occurring at Defendant's silicomanganese production facility in New Haven, Mason County, West Virginia (the "Facility").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

3.     This Court has jurisdiction over West Virginia's State Law Claims pursuant to 28 U.S.C. § 1367 because the State Law Claims are related to the Federal Law Claims and form part of the same case or controversy.

4.     Venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1395(a), as well as Section 113(b) of the CAA, 42 U.S.C. § 7413(b), because it is the judicial district in which the violations of the CAA giving rise to these Claims occurred and the Defendant owns and operates the Facility in this judicial district.

## NOTICES

5.     In accordance with CAA Sections 113(a)(1) and (b)(1), 42 U.S.C. § 7413(a)(1) and (b)(1), on January 4, 2013, EPA issued to Defendant a Notice of Violation ("NOV"), Docket No. CAA-III-13-001, for the violations of the CAA alleged herein and provided a copy to the State of West Virginia at that time.

6.     In accordance with CAA Section 113(b), 42 U.S.C. § 7413(b), the United States has provided notice of the commencement of this action to WV DEP.

## AUTHORITY

7.     The United States has the authority to bring this action on behalf of the Administrator of EPA under Section 305 of the CAA, 42 U.S.C. § 7605.  Authority to bring this

action is vested in the Attorney General of the United States pursuant to CAA Sections 113(b) and 305, 42 U.S.C. §§ 7413(b) and 7605, and 28 U.S.C. §§ 516 and 519.

8.      Pursuant to W.Va. Code §§ 22-5-6(a) and 22-5-7, the Director of the WV DEP is authorized to commence a civil action for injunctive relief and the assessment of civil penalties whenever a person violates any provision of the West Virginia Air Pollution Control Act, W.Va. Code §§ 22-5-1 *et seq*., or any permit, rule, or order issued thereunder.

DEFENDANT

9.      Defendant Felman Production, LLC is a limited liability company organized under the laws of the State of Delaware in September 2005.  Defendant is a wholly-owned subsidiary of Georgian-American Alloys, Inc.  Defendant is registered to do business in the State of West Virginia as a foreign limited liability company.

10.     Defendant is headquartered in New Haven, West Virginia, where its sole production facility is located.

11.     Defendant owns and operates a silicomanganese production facility situated on approximately 190 acres along the Ohio River in New Haven, Mason County, West Virginia (the "Facility").

12.     Defendant is a "person" as defined in Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

DEFENDANT'S SILICOMANGANESE OPERATIONS

13.     The silicomanganese produced at the Facility is used as an additive in steel production.

14. Defendant's silicomanganese production process involves the use of coke, coal, dolomite, quartzite and manganese oxide ore as charge material which is poured into three furnaces to be melted.

15. The furnaces are submerged arc furnaces which are located in the structure known as the "Shop Building" at the Facility.

16. The furnaces are referred to as Furnace Nos. 2, 5, and 7.

17. Three carbon electrodes are needed to generate the heat required to melt the charge material in each furnace.

18. As the charge material melts, more charge material is added to the furnaces.

19. After a specified amount of electricity is used to melt the charge material, the furnaces are tapped and the molten material flows from the furnaces into a ladle.

20. During this process, molten slag rises to the top of the molten metal.

21. Defendant then pours and rakes off the slag and, once it cools, dumps the slag outside the Shop Building for processing for third party use.

22. The remaining molten metal is poured from the ladle into a casting net and then cooled before being stockpiled.

23. Defendant feeds the metal from the stockpile through crushing and sizing operations which form the finished silicomanganese product into various sizes according to customer specifications.

24. Sources of air pollutant emissions at the Facility include, among other things, submerged arc furnaces Nos. 2, 5, and 7, and their related equipment, as well as the equipment related to Defendant's crushing and sizing operations.

4

25.     The silicomanganese production process generates air pollutants in the form of particulate matter ("PM").

26.     The PM generated through the silicomanganese production process results from

   a.   the transfer of the charge material into the furnaces,

   b.   the heating process for the charge material,

   c.   the tapping of the furnaces,

   d.   the removal of slag from the ladles,

   e.   the transfer of molten metal to the casting areas, and

   f.   the crushing and sizing operations.

27.     Manganese is emitted as a component of PM during one or more components of the silicomanganese production process.

<u>STATUTORY AND REGULATORY BACKGROUND</u>

**I.     The Clean Air Act**

28.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the Nation's air so as to promote the public health and welfare and the productive capacity of its population.  CAA Section 101(b)(1), 42 U.S.C. § 7401(b)(1).

29.     Section 109(a) of the Act, 42 U.S.C. § 7409(a), requires the Administrator of EPA to publish and maintain primary and secondary national ambient air quality standards ("NAAQS") for certain criteria air pollutants.  The primary NAAQS "are requisite to protect the public health," and the secondary NAAQs are "requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air."  42 U.S.C. § 7409(b)(1)-(2).  The NAAQS promulgated by EPA pursuant to this provision are set forth in 40 C.F.R. Part 50.

30.     PM is an "air pollutant" within the meaning of CAA Sections 108 and 302, 42 U.S.C. §§ 7408 and 7602.  PM is measured in the ambient air as particulate matter of a diameter of 10 micrometers or less ("PM10") and particulate matter of a diameter of 2.5 micrometers or less ("PM2.5").  42 U.S.C. § 7602(t); 40 C.F.R. § 50.6 and .7.  In accordance with CAA Sections 109(a) and (b), EPA has promulgated NAAQS for several air pollutants, including PM10 and PM2.5 which are codified at 40 C.F.R. §§ 50.6 and 50.7.

A.     *West Virginia SIP*

31.     To achieve the objectives of the NAAQS and the CAA, Section 110 of the CAA, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a State Implementation Plan ("SIP") that provides for the implementation, maintenance and enforcement of the NAAQS established under CAA Section 109.  Section 110(a)(2)(A) of the CAA, 42 U.S.C. § 7410(a)(2)(A), requires that each SIP include enforceable emission limitations.

32.     After a SIP or a SIP revision has been approved by EPA, the approved provisions constitute the state's "applicable implementation plan," within the meaning of CAA Sections 113 and 302(q), 42 U.S.C. §§ 7413 and 7602(q), and those approved provisions are federally enforceable under CAA Section 113(a) and (b), 42 U.S.C. § 7413(a) and (b).

33.     Pursuant to CAA Section 110, 42 U.S.C. § 7410, the State of West Virginia adopted various regulations as part of its State Implementation Plan ("West Virginia SIP").  EPA first approved the West Virginia SIP in 1972.  37 Fed. Reg. 10841, 10902 (May 31, 1972).  The West Virginia SIP has been periodically revised and includes regulations EPA approved as part of the applicable implementation plan for the State of West Virginia.  These regulations are hereafter referred to as the "West Virginia SIP Rules."  See 40 C.F.R. Part 52, Subpart XX.

34.     In 2003, EPA approved West Virginia Code of State Regulations ("W. Va. CSR") § 45-7-1 *et seq.* as part of the West Virginia SIP Rules, including W. Va. CSR § 45-7-3 (opacity limits regulating the emission of smoke and/or PM) and W. Va. CSR § 45-7-5 (requirements to control fugitive PM).  68 Fed. Reg. 33,010 (June 3, 2003).

35.     The purpose of W. Va. CSR § 45-7-1 *et seq.* is "to prevent and control particulate matter air pollution from manufacturing processes and associated operations."

36.     W. Va. CSR § 45-7-2 (2.20) defines "manufacturing process" as "any action, operation or treatment, embracing chemical, industrial or manufacturing efforts, and employing, for example, heat treating furnaces, by-product coke plants, core-baking ovens, mixing kettles, cupolas, blast furnaces, open hearth furnaces, heating and reheating furnaces, puddling furnaces, sintering plants, electric steel furnaces, ferrous and non-ferrous foundries, kilns, stills, driers, crushers, grinders, roasters, and equipment used in connection therewith and all other methods or forms of manufacturing or processing that may emit smoke, particulate matter or gaseous matter."

37.     W. Va. CSR § 45-7-2 (2.25) defines "particulate matter" as "any material, except uncombined water, that exists in a finely divided form as a liquid or solid."

38.     Defendant's Facility is subject to the West Virginia SIP Rules governing emissions from stationary sources including, but not limited to, W. Va. CSR §§ 45-7-3, and 45-7-5 (effective August 31, 2000) because it has "manufacturing process[es]" that produce particulate matter air pollution, including PM10 and PM2.5.

39.     W. Va. CSR § 45-7-2 (2.23) defines "opacity" as "the degree to which emissions reduce the transmission of light and obscure the view of an object in the background."

40.     W. Va. CSR § 45-7-2 (2.37) defines "smoke" as "small gasborne and airborne particulate matter emitted in sufficient numbers to be visible."

41.     W. Va. CSR § 45-7-2 (2.16) defines "fugitive particulate matter" as "any and all particulate matter which, if not confined, would be emitted directly into the open air from points other than a stack outlet."

42.     W. Va. CSR § 45-7-2 (2.38) defines "source operation" as "the last operation in a manufacturing process preceding the emission of air contaminants which operation: (2.38.a.) [r]esults in the separation of air contaminants from the process materials or in the conversion of the process materials into air contaminants; and (2.38.b.) [i]s not an air pollution abatement operation."

43.     W. Va. CSR § 45-7-3 (3.1) prohibits any process source operation from emitting smoke or PM into the open air in excess of twenty (20) percent opacity, subject to certain exceptions including WV CSR § 45-7-3 (3.2).

44.     W. Va. CSR § 45-7-3 (3.2) allows the emission of smoke or PM into the open air from a process source operation of less than forty (40) percent opacity, but only for an aggregate of no more than five (5) minutes in any sixty (60) minute period.

45.     W. Va. CSR § 45-7-5 (5.1) prohibits any manufacturing process or storage structure that generates fugitive PM to operate without a system "to minimize the emissions of fugitive particulate matter," which may include, but is not limited to, "process equipment design, control equipment design or operation and maintenance procedures."  WV CSR § 45-7-5 (5.1) further clarifies that "[t]o minimize" means that "such system shall be installed, maintained and operated to ensure the lowest fugitive particulate matter emissions reasonably achievable."

46.     W. Va. CSR § 45-7-5 (5.3) states that "[t]he provisions of subsections 3.1, 3.2, and 5.1 shall not apply to particulate matter emitted from the operation of a ferroalloy electric submerged arc furnace in existence prior to June 1, 1993 during blowing taphole events, poling and oxygen lancing operations.  Poling emissions shall not exceed five (5) minutes in duration during any poling operation."

47.     W. Va. CSR § 45-7-2 (2.3) defines "blowing tap" as "any tap associated with ferroalloy submerged arc furnace in which an evolution of gas forces or projects jets of flame or metal sparks beyond the ladle, runner or collection hood."

48.     W. Va. CSR § 45-7-2 (2.29) defines "poling" as "pushing a log timer into the furnace taphole to clear slag from the furnace tapping channel associated with operation of a ferroalloy electric submerged arc furnace."

49.     W. Va. CSR § 45-7-2 (2.24) defines "oxygen lancing" as "the burning open of a taphole to remove slag or product from the taphole associated with operations of a ferroalloy electric submerged arc furnace."

> B.     *Ferroalloys Maximum Achievable Control Technology ("MACT") Regulations*

50.     Pursuant to CAA Section 112(d), 42 U.S.C. § 7412(d), EPA promulgated 40 C.F.R. Part 63, Subpart XXX, the National Emission Standards for Hazardous Air Pollutants for Ferroalloys Production: Ferromanganese and Silicomanganese.  *See* 64 Fed. Reg. 27458 (May 20, 1999).  EPA promulgated amendments to 40 C.F.R. Part 63, Subpart XXX, which established new emission limits for open submerged arc furnaces (the "Ferroalloys MACT").  66 Fed. Reg. 16007 (March 22, 2001).

51.     EPA issued new amendments to the Ferroalloys MACT at 40 C.F.R. §§63.1620 - 63.1629 on June 30, 2015 (to address the results of a residual risk and technology review

conducted pursuant to Section 112(f)(2) and (d)(6) of the Act, 42 U.S.C. § 7412(f)(2) and (d)(6)), ("Post RTR Ferroalloy MACT"), and amendments to the Post RTR Ferroalloy MACT on January 18, 2017 ("Post RTR Ferroalloy MACT, as amended").

52.     The Ferroalloys MACT applies to "all new and existing ferromanganese and silicomanganese production facilities that manufacture ferromanganese or silicomanganese and are major sources."  40 C.F.R. § 63.1650(a).

53.     The CAA defines "major source" as "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants."  Section 112 of the CAA, 42 U.S.C. § 7412.

54.     The Ferroalloys MACT contains emissions standards that limit PM emission, as a surrogate for hazardous air pollutants ("HAPs"), from existing and new or reconstructed emission sources.  66 Fed. Reg. 16007, 16008 (March 22, 2001).

55.     Manganese compounds are listed as a "hazardous air pollutant" regulated under the Section 112(b) of the CAA, 42 U.S.C. § 7412(b).

56.     Manganese compounds are regulated as a hazardous air pollutant under W. Va. CSR § 45-34-1 *et seq.*

57.     Sources of emissions at ferromanganese and silicomanganese production facilities that are subject to the Ferroalloys MACT include, *inter alia*, "[o]pen submerged arc furnaces with a furnace power input greater than 25 [megawatts] when producing silicomanganese," "[o]pen submerged arc furnaces with a furnace power input of 25 MW or less when producing

silicomanganese," "[c]rushing and screening operations," and "[f]ugitive dust sources."  40 C.F.R. §§ 63.1650(b)(3),(4),(7) and (8).

58.     The Ferroalloys MACT defines "open submerged arc furnace" as an "electric submerged arc furnace that is equipped with a canopy hood above the furnace to collect primary emissions."  40 C.F.R. § 63.1651.

59.     A building which houses one or more submerged arc furnaces is a "shop", as defined by the Ferroalloys MACT.  40 C.F.R. § 63.1651.

60.     The Ferroalloys MACT defines "crushing and screening equipment" as "the crushers, grinders, mills, screens and conveying systems used to crush, size, and prepare for packing manganese-containing materials, including raw materials, intermediate products, and final products."  40 C.F.R. § 63.1651.

61.     The Ferroalloys MACT states that "no owner or operator shall cause emissions exiting from a shop due solely to operations of any affected submerged arc furnace, to exceed 20 percent opacity for more than one 6-minute period during any performance test."  40 C.F.R. § 63.1653. There are only two exceptions to this rule: (1) "[v]isible particulate emissions from a shop due solely to operation of a semi-closed submerged arc furnace, may exceed 20 percent opacity, measured as a 6-minute average, one time during any performance test, so long as the emissions never exceed 60 percent opacity, measured as a 6-minute average" (40 C.F.R. § 63.1653(a)); and (2) "[b]lowing taps, poling and oxygen lancing of the tap hole; burndowns associated with electrode measurements; and maintenance activities associated with submerged arc furnaces and casting operations are exempt from the opacity standards specified in this section" (40 C.F.R. § 63.1653(b)).

62.     To demonstrate compliance with opacity standards, the Ferroalloys MACT requires owners and operators to "conduct initial opacity observations of the shop building" while "simultaneously establish[ing] parameter values for one of the following: the control system fan motor amperes and all capture system damper positions, the total volumetric flow rate to the air pollution control device and all capture system damper positions, or volumetric flow rate through each separately ducted hood that comprises the capture system."  40 C.F.R. §§ 63.1656(d)(1) and (2).  Alternatively, the owner or operator may use the provisions of 40 C.F.R. § 63.8(f) to request approval to use an alternative monitoring method.  40 C.F.R. § 63.1657(c).

63.     The Ferroalloys MACT sets forth shop opacity monitoring requirements. Specifically, an owner or operator must utilize one of three monitoring options: (1) "check and record the control system fan motor amperes and capture system damper positions once per shift"; (2) "install, calibrate, and maintain a monitoring device that continuously records the volumetric flow rate through each separately ducted hood"; or (3) "install, calibrate, and maintain a monitoring device that continuously records the volumetric flow rate at the inlet of the air pollution control device and . . . check and record the capture system damper positions once per shift." 40 C.F.R. § 63.1657(c)(1)-(3).

64.     The Ferroalloys MACT requires that "[a]t all times, including periods of startup, shutdown, and malfunction, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions." 40 C.F.R. § 63.6(e)(1)(i).

65.     Defendant's Facility is a "major source" as defined by CAA Section 112, 42 U.S.C. § 7412(a)(1), because the Facility is a stationary source that has the potential to emit 10 tons per year or more of manganese compounds, a regulated HAP under 42 U.S.C. § 7412(b)(1).

66.     Defendant's Facility is subject to the Ferroalloys MACT because it is an existing silicomanganese production facility that manufactures silicomanganese and is a major source.

67.     The electric arc furnaces at the Defendant's Facility known as Furnace Nos. 2, 5, and 7 are each an "open submerged arc furnace" as defined by the Ferroalloys MACT, 40 C.F.R. § 63.1651.

68.     The structure that houses Furnace Nos. 2, 5, and 7 at the Facility is a "shop" as defined by the Ferroalloys MACT, 40 C.F.R. § 63.1651.

69.     For the purposes of this Complaint, the structure at the Facility that houses Furnace Nos. 2, 5, and 7, and their associated equipment, is referred to as the "Shop Building."

70.     Furnace Nos. 2, 5, and 7 at the Facility are subject to the Ferroalloys MACT.

71.     Defendant's Facility contains "crushing and screening equipment" as defined by the Ferroalloys MACT, 40 C.F.R. § 63.1651.

72.     The crushing and screening equipment at the Defendant's Facility are subject to the Ferroalloys MACT.

73.     Fugitive dust sources at Defendant's Facility are subject to the Ferroalloys MACT.

74.     The electric arc furnaces, crushing and screening equipment, and fugitive dust sources at the Defendant's Facility are subject to the West Virginia Code of State Regulations for Emissions Standards for Hazardous Air Pollutants W. Va. CSR § 45-34-1 *et seq.* (incorporates by reference and makes enforceable by WV DEP the Ferroalloys MACT).

13

### C.    Title V Operating Permits

75.     Title V of the Act, CAA Sections 501-507, 42 U.S.C. §§ 7661 to 7661f,

establishes an operating permit program for certain emission sources, including "major sources."

76.     Pursuant to CAA Section 502(a), 42 U.S.C. § 7661a(b), on July 21, 1992, EPA

promulgated regulations implementing the requirements of Title V and establishing the

minimum elements of a major source operating permit program to be administered by any

approved air pollution control agency.  57 Fed. Reg. 32250 (July 21, 1992).  These regulations

are codified at 40 C.F.R. Part 70.

77.     Pursuant to 40 C.F.R. Part 70, EPA granted final approval to West Virginia's

Title V operating permit program, effective December 15, 1995. 60 Fed. Reg. 57,352 (Nov. 15,

1995).  West Virginia's Title V operating permit program is currently codified in the West

Virginia Code of State Regulations at W. Va. CSR § 45-30-1 et seq.

78.     Section 502(a) of the CAA (42 U.S.C. § 7661a(a) makes it unlawful for any

person to violate any requirement of a permit issued under Title V or to operate a major source

except in compliance with a permit issued by a permitting authority under Title V.  The federal

Title V regulations (40 C.F.R. § 70.6(a)) and the West Virginia Title V operating permit program

regulations (WV CSR § 45-30-3 (3.1)) have at all relevant times required that each Title V

permit include, among other things, provisions stating that the permittee must comply with all

conditions of the permit, and that any permit noncompliance constitutes a violation of the Clean

Air Act and is grounds for enforcement.

79.     Pursuant to CAA Section 504(a), 42 U.S.C. § 7661c(a), the federal implementing

regulations of the Act, 40 C.F.R. Part 70, and the West Virginia Title V operating permit

program regulations, W. Va. CSR § 45-30-5 (5.1.a), have at all relevant times required that each

Title V permit include, among other things, enforceable emission limitations and such other conditions as are necessary to assure compliance with applicable requirements of the Clean Air Act and the requirements of the applicable SIP.

80.     In accordance with CAA Section 113(b), 42 U.S.C. § 7613(b), operating permits issued under an approved program are federally enforceable.

### 1.     The Title V Permit for the Facility

81.     The Facility is a "major source" as that term is defined in CAA Section 501(2), 42 U.S.C. § 7661(2), because the Facility is a stationary source that has the potential to emit 10 tons per year or more of manganese compounds, a regulated HAP  under 42 U.S.C. § 7412(b)(1).

82.     Pursuant to its authority under Title V of the Act, the WV DEP issued the Defendant a Permit to Operate, R30-05300004-2007, on August 8, 2007, for the operation of emission sources at the Facility.  WV DEP renewed this permit, effective April 9, 2013, upon issuance of Permit to Operate R30-05300004-2013.  For purposes of the Claims set forth in this Complaint, the relevant terms of the 2007 and 2013 operating permits are the same except as specifically noted and are referred to as the "WV Operating Permit."

83.     Condition 2.13.1 of the WV Operating Permit requires that Defendant comply with "all conditions" of the permit and that any noncompliance with the permit "constitutes a violation of the West Virginia Code and the [Federal] Clean Air Act and is grounds for enforcement action by the Secretary or USEPA."

84.     Condition 3.1.8 of the WV Operating Permit (Facility-Wide Requirements-Limitations and Standards) prohibits anyone from "caus[ing], suffer[ing], allow[ing] or permit[ting] any manufacturing process or storage structure generating fugitive particulate matter

to operate that is not equipped with a system, which may include, but not be limited to, process equipment design, control equipment design or operation and maintenance procedures, to minimize the emissions of fugitive particulate matter.  To minimize means such systems shall be installed, maintained and operated to ensure the lowest fugitive particulate matter emissions reasonably achievable." (This provision is found at Condition "3.1.9" in the 2013 WV Operating Permit.)

85.     Condition 4.1.6 of the WV Operating Permit (Requirements for Furnaces-Limitations and Standards) prohibits anyone from "caus[ing], suffer[ing], allow[ing] or permit[ting] any manufacturing process generating fugitive particulate matter to operate that is not equipped with a system, which may include, but not be limited to, process equipment design, control equipment design or operation and maintenance procedures, to minimize the emissions of fugitive particulate matter.  To minimize means such systems shall be installed, maintained and operated to ensure the lowest fugitive particulate matter emissions reasonably achievable."

86.     Condition 4.1.1 of the WV Operating Permit (Furnace Requirements- Limitations and Standards) and Condition 5.1.1 of the WV Operating Permit (Manufacturing Processes Requirements- Limitations and Standards) prohibit the "emission of smoke and/or particulate matter emitted into the open air from any process source operation which is greater than twenty (20) percent opacity, except for smoke and/or particulate matter emitted from any process source operation which is less than forty (40) percent opacity for any period or periods aggregating no more than five (5) minutes in any sixty (60) minute period."

87.     Condition 4.1.7 of the WV Operating Permit (Furnace Requirements- Limitations and Standards) states that Conditions 4.1.1 and 4.1.6 of the WV Operating Permit "shall not apply to particulate matter emitted from the operation of an existing ferroalloy electric

submerged arc furnace during blowing taphole events, poling and oxygen lancing operations. Poling emissions shall not exceed five (5) minutes in duration during any poling operation."

88.     Condition 4.2.3.a of the WV Operating Permit (Monitoring Requirements) requires Defendant to "conduct initial opacity observations of the shop building to demonstrate compliance with the applicable opacity standards according to 40 C.F.R. § 63.6(h)(5), which addresses the conduct of opacity or visible emission observations."

89.     Condition 4.2.3.b.1 of the WV Operating Permit (Monitoring Requirements) states that "[w]hen demonstrating initial compliance with the shop building opacity standard, as required by Section 4.2.3.a.1 of this permit, the owner or operator must simultaneously establish parameter values for one of the following: the control system fan motor amperes and all capture system damper positions, the control system fan motor amperes and all capture system damper positions, the total volumetric flow rate to the air pollution control device and all capture system damper positions, or volumetric flow rate through each separately ducted hood that comprises the capture system."[1]

90.     To demonstrate continuing compliance with the opacity standards, Condition 4.2.3.c of the WV Operating Permit (Monitoring Requirements) requires Defendant to follow "the monitoring requirements specified in Section 4.2.4 of this permit."

91.     Condition 4.2.4 of the WV Operating Permit (Monitoring Requirements- Shop opacity) requires Defendant to select a monitoring option that is "consistent with that selected during the initial performance test described in Section 4.2.3.b of [the WV Operating Permit]", although Defendant may "request approval to use an alternative monitoring method."

---

[1] The underlined portion of this permit condition is underlined in the 2013 permit only.

92.     Condition 4.2.4 of the WV Operating Permit (Monitoring Requirements- Shop opacity) requires Defendant to comply with one of the monitoring options in Condition 4.2.4.a., 4.2.4.b., or 4.2.4.c.  Monitoring option 4.2.4.a. states that "[t]he owner or operator must check and record the control system fan motor amperes and capture system damper positions once per shift."

93.     Condition 4.2.4.g. of the WV Operating Permit (Monitoring Requirements- Shop opacity) states that "[f]ailure to monitor or failure to take corrective action under the requirements of Section 4.2.4 of this permit is a violation of the general duty to operate in a manner consistent with good air pollution control practices that minimizes emissions per 40 C.F.R. § 63.6(e)(1)(i)."

94.     Condition 4.4.4 of the WV Operating Permit (Recordkeeping Requirements) requires the permittee to "maintain a certified log of the time, duration and furnace number of all 'blowing tap holes,' 'poling,' and 'oxygen lancing' at each furnace.  This log must be made available upon request of any representative of the Division of Air Quality and must be retained for five (5) years."

95.     Condition 4.6.1 of the 2013 WV Operating Permit (Compliance Plan) required Defendant to "determine the operating parameters as required in Section 4.2.3.b.1." and to "submit a request for a Modification of the Title V Permit to incorporate the parametric values into the Permit by April 12, 2013."

> ### D.      *Enforcement Provisions of the Clean Air Act*

96.     Pursuant to CAA Section 113(a)(1) and (3), 42 U.S.C. § 7413(a)(1) and (3), EPA may bring a civil action in accordance with CAA Section 113(b), 42 U.S.C. § 7413(b), whenever EPA finds that any person has violated or is in violation of any requirement or prohibition of an

18

applicable SIP, Title V permit, or, *inter alia*, any emission standards promulgated pursuant to CAA Section 112(d), 42 U.S.C. § 7412(d).

97.     Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), the United States is authorized to commence a civil action for injunctive relief and assessment of civil penalties whenever a person has violated or is in violation of any requirement or prohibition of the CAA, any rule promulgated under the CAA, or any applicable SIP.  Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and 40 C.F.R. Part 19, violators are subject to civil penalties of up to $32,500 per day for each violation alleged herein occurring after March 15, 2004 and through January 12, 2009, and up to $37,500 per day for each violation alleged herein occurring after January 12, 2009.  Pursuant to CAA Section 113(e), 42 U.S.C. § 7413(e), upon a *prima facie* showing that the conduct giving rise to the violations are likely to have continued or recurred, the days of violation are presumed to be continuing.

> E.     *Enforcement Provisions of the West Virginia Air Pollution Control Act*

98.     The West Virginia Air Pollution Control Act, W.Va. Code §§ 22-5-1 *et seq*. ("WV APCA"), provides a coordinated statewide program of air pollution prevention, abatement and control.  Pursuant to W.Va. Code § 22-5-3, it is unlawful for any person to, *inter alia*, cause statutory air pollution.  Pursuant to W.Va. Code § 22-5-6, it is unlawful for any person to violate the provisions of the WV APCA or any permit or rule issued pursuant to the WV APCA.

99.     Pursuant to W.Va. Code §§ 22-5-6(a) and 22-5-7, the Director of the WV DEP is authorized to commence a civil action for injunctive relief and the assessment of civil penalties whenever a person violates any provision of the WV APCA, or any permit or any rule or order

issued pursuant to the WV APCA.  Violators are subject to civil penalties of up to $10,000 per day for each violation.  W.Va. Code §§ 22-5-6(a).

## FIRST CLAIM FOR RELIEF

*(Failure to Establish Parameter Values to Demonstrate Compliance with Shop Building Opacity Standards)*

100.    The preceding Paragraphs are re-alleged as if fully set forth herein.

101.    Defendant is subject to the requirement to demonstrate compliance with opacity standards as set forth in 40 C.F.R. § 63.1656(d) and incorporated into WV Operating Permit Condition 4.2.3.

102.    Defendant elected to demonstrate compliance with the applicable opacity standards for the Shop Building by choosing the monitoring method identified in Condition 4.2.4.a of the WV Operating Permit which states that the "owner or operator must check and record the control system fan motor amperes and capture system damper positions once per shift."

103.    From the time Defendant acquired and began operations at the Facility in approximately September 2006 until approximately October 2014, Defendant failed to establish opacity compliance parameter values for the control system fan amperes and all capture system damper positions associated with Furnace No. 2 in the Shop Building as required by WV Permit Condition 4.2.3.b.1.

104.    Defendant did not request approval from the permitting authority to use an alternative monitoring method to demonstrate compliance with the applicable opacity standards for the Shop Building pursuant to WV Permit Condition 4.2.4.

105.     Defendant failed to submit a request for a Modification of the Title V Permit to incorporate the parameter values into the 2013 WV Operating Permit by April 12, 2013, as required by Condition 4.6.1 of the 2013 WV Operating Permit in violation of the 2013 WV Operating Permit and Section 502 of the CAA, 42 U.S.C. § 7661a.

106.     By failing to establish parameter values for the control system fan amperes and all capture system damper positions for Furnace No. 2 in its Shop Building until October 2014, Defendant violated Condition 4.2.3.b of its WV Operating Permit, the Ferroalloys MACT (40 C.F.R. § 63.1656(d)), and Section 502 of the CAA, 42 U.S.C. § 7661a.

107.     The alleged violations of the Ferroalloys MACT, the WV Operating Permit, and the CAA, as set forth in this Claim for Relief, make Defendant subject to civil penalties of up to $32,500 per day for each violation occurring after March 15, 2004 and through January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.  Defendant is also subject to civil penalties pursuant to W. Va. Code 22-5-6(a).

<u>SECOND CLAIM FOR RELIEF</u>

*(Violation of Opacity Monitoring Requirements)*

108.     The preceding Paragraphs are re-alleged as if fully set forth herein.

109.     Defendant is subject to the shop opacity monitoring requirements set forth in 40 C.F.R. § 63.1657(c) and incorporated into WV Operating Permit Conditions 4.2.4.a.-g.

110.     On numerous occasions from approximately May 2009 until at least October 2012, Defendant failed to check and record the control system fan motor amperes and capture system damper positions once per shift.

21

111.     From approximately May 2009 until at least October 2012, Defendant did not install, calibrate, and maintain a monitoring device that continuously records the volumetric flow rate through each separately ducted hood.

112.     From approximately May 2009 until at least October 2012, Defendant did not install, calibrate, and maintain a monitoring device that continuously records the volumetric flow rate at the inlet of the air pollution control device and check and record the capture system damper positions once per shift.

113.     Defendant did not request approval from the permitting authority to use an alternative monitoring method to demonstrate compliance with the applicable opacity standards for the Shop Building pursuant to WV Permit Condition 4.2.4.

114.     By failing to check and record the control system fan motor amperes and capture system damper positions once per shift, and by failing to comply with any other allowable shop opacity monitoring option from approximately May 2009 until at least October 2012, Defendant violated Condition 4.2.4 of its WV Operating Permit, the Ferroalloys MACT (40 C.F.R. § 63.1657(c)), and Section 502 of the CAA (42 U.S.C. § 7661a).

115.     By failing to comply with the monitoring requirements in Condition 4.2.4 of its WV Operating Permit, from approximately May 2009 until at least October 2012, Defendant failed to demonstrate continuing compliance with the applicable opacity standards and therefore violated Condition 4.2.3.c. of its WV Operating Permit, the Ferroalloys MACT (40 C.F.R. § 63.1656(d)), and Section 502 of the CAA (42 U.S.C. § 7661a).

116.     The alleged violations of the Ferroalloys MACT, the WV Operating Permit, and the CAA, as set forth in this Claim for Relief, make Defendant subject to civil penalties of up to

22

$37,500 per day for each violation occurring after January 12, 2009.  Defendant is also subject to civil penalties pursuant to W. Va. Code 22-5-6(a).

<u>THIRD CLAIM FOR RELIEF</u>

*(Violation of Duty to Use Good Air Pollution Control Practices)*

117.    The preceding Paragraphs are re-alleged as if fully set forth herein.

118.    Defendant is subject to the shop opacity monitoring requirements set forth in 40 C.F.R. § 63.1657(c) and incorporated into WV Operating Permit Conditions 4.2.4.a.-g.

119.    Pursuant to Condition 4.2.4.g. of the WV Operating Permit, Defendant's failure to monitor in violation of Condition 4.2.4, as discussed in Paragraphs 110 through 113, is also a violation of the general duty to operate in a manner consistent with good air pollution control practices that minimizes emissions per 40 C.F.R. § 63.6(e)(1)(i).

120.    By failing to operate in a manner consistent with good air pollution control practices that minimizes emissions, Defendant violated Condition 4.2.4.g of its WV Operating Permit, the Ferroalloys MACT (40 C.F.R. § 63.6(e)(1)(i)), and Section 502 of the CAA (42 U.S.C. § 7661a).

121.    The alleged violations of the Ferroalloys MACT, the WV Operating Permit, and CAA, as set forth in this Claim for Relief, make Defendant subject to civil penalties of up to $37,500 per day for each violation occurring after January 12, 2009.  Defendant is also subject to civil penalties pursuant to W. Va. Code 22-5-6(a).

<u>FOURTH CLAIM FOR RELIEF</u>

*(Particulate Emission Opacity Violations)*

122.    The preceding Paragraphs are re-alleged as if fully set forth herein.

23

123.    Defendant is subject to the particulate matter control requirements set forth in W. Va. CSR §§ 45-7-3(3.1) and (3.2) and incorporated into WV Operating Permit Conditions 4.1.1 and 5.1.1.

124.    Emissions of smoke and/or particulate matter from the Shop Building at the Facility exceeded twenty percent opacity for a period or periods which, in the aggregate, total more than five minutes in a sixty-minute period, or were at forty percent opacity or above, on numerous occasions between 2009 and 2015, including but not limited to May 21, 2009, June 11, 2012, June 19, 2012, June 22, 2012, July 31, 2012, August 1, 2012, and February 11, 2015.

125.    The opacity exceedences identified in Paragraph 124 did not occur during the following events: blowing taps, poling and oxygen lancing of the tap hole; burndowns associated with electrode measurements; or maintenance activities associated with submerged arc furnaces and casting operations.

126.    By emitting smoke and/or particulate matter from the Shop Building at the Facility that exceeded twenty percent opacity for a period or periods which, in the aggregate, total more than five minutes in a sixty-minute period, or that were at or above forty percent opacity at any time, as described in this Claim for Relief, Defendant violated its WV Operating Permit (Conditions 4.1.1 and 5.1.1), the West Virginia SIP (W. Va. CSR §§ 45-7-3 (3.1) and 45-7-3 (3.2)), and Section 502 of the CAA (42 U.S.C. § 7661a).

127.    The alleged violations of the WV Operating Permit, the West Virginia SIP, and the CAA, as set forth in this Claim for Relief, make it subject to civil penalties of up to $37,500 per day for each violation occurring after January 12, 2009.  Defendant is also subject to civil penalties pursuant to W. Va. Code 22-5-6(a).

## FIFTH CLAIM FOR RELIEF

### *(Failure to Control Fugitive Emissions)*

128.    The preceding Paragraphs are re-alleged as if fully set forth herein.

129.    Defendant is subject to the fugitive emissions control requirements set forth in W. Va. CSR §§ 45-7-5(5.1) and (5.3) and incorporated into WV Operating Permit Conditions 3.1.8, 4.1.6, and 4.1.7.

130.    The manufacturing processes at the Facility generate fugitive PM emissions.

131.    Sources of fugitive PM emissions at the Facility include, *inter alia*, Furnace Nos. 2, 5, and 7, tapping, casting, slag raking, and crushing and sizing operations.

132.    On February 11, 2015, WV DEP observed fugitive PM emissions emanating from the Shop Building at the Facility.

133.    On March 13, 2012, EPA observed fugitive PM emissions emanating from the Shop Building at the Facility.

134.    Additional fugitive PM emissions were observed emanating from the Shop Building at the Facility that exceeded twenty percent opacity for a period or periods which, in the aggregate, total more than five minutes in a sixty-minute period, or that were at or above forty percent opacity at any time, in violation of Defendant's WV Operating Permit (Conditions 4.1.1 and 5.1.1), on numerous occasions, including, but not limited to, May 21, 2009, June 11, 2012, June 19, 2012, June 22, 2012, July 31, 2012,  August 1, 2012, and February 11, 2015 .

135.    The emissions identified in Paragraphs 132 through 134 were emissions of "fugitive particulate matter" as defined by W. Va. CSR § 45-7-2 (2.16).

136.    The fugitive PM emissions identified in Paragraphs 132 through 134 did not occur during blowing taphole events, poling, or oxygen lancing operations, events listed by Condition

4.1.7 of Defendant's WV Operating Permit as exempt from the fugitive emissions control requirements of Condition 4.1.6 of Defendant's WV Operating Permit.

137.    From at least May 21, 2009 until February 11, 2015, Defendant failed to equip the Facility with process equipment design, control equipment design, or operation and maintenance procedures to minimize the emissions of fugitive PM from the Shop Building as required by WV Permit Conditions 3.1.8 and 4.1.6.

138.    By failing to control fugitive emissions as discussed in Paragraphs 132 to 134, Defendant is in violation of its WV Operating Permit (Conditions 3.1.8 and 4.1.6), the West Virginia SIP (W. Va. CSR § 45-7-5)((5.1), and Section 502 of the CAA (42 U.S.C. § 7661a).

139.    The alleged violations of the WV Operating Permit, the West Virginia SIP, and the CAA, as set forth in this Claim for Relief, make Defendant subject to civil penalties of up to $37,500 per day for each violation occurring on or after January 13, 2009.  Defendant is also subject to civil penalties pursuant to W. Va. Code 22-5-6(a).

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, the United States of America and the State of West Virginia, respectfully requests that this Court:

A.    Permanently enjoin Defendant from operating the Facility in violation of the CAA, including the Ferroalloys MACT, the West Virginia SIP Rules, Defendant's WV Operating Permit provisions, and any other operating permits issued to the Facility and the conditions contained therein, and the WV APCA;

B.    Require Defendant to comply with all applicable permits and to undertake and complete expeditiously all actions necessary to achieve and maintain compliance with the CAA, including the Ferroalloys MACT, the West Virginia SIP Rules, Defendant's WV Operating

26

Permit, and any other operating permits issued to the Facility and the conditions contained

therein, and the WV APCA;

C.      Assess civil penalties against Defendant of up to $32,500 per day for each

violation occurring after March 15, 2004 and through January 12, 2009, and up to $37,500 per

day for each violation occurring after January 12, 2009 for violations of the CAA, including the

Ferroalloys MACT, the West Virginia SIP Rules, Defendant WV Operating Permit, and any

other operating permits issued to the Facility and the conditions contained therein, and the WV

APCA;

D.      Award Plaintiffs their costs and disbursements in this action; and,

E.      Grant Plaintiffs such other relief as the Court may deem just and proper.


Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

NATHANIEL DOUGLAS
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

/s/ Alexandra B. Sherertz_____
ALEXANDRA B. SHERERTZ
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 514-0414
Fax: (202) 514-0097
E-Mail: Alexandra.Sherertz@usdoj.gov

MICHAEL B. STUART
United States Attorney

s/Stephen M. Horn
STEPHEN M. HORN: 1788
Assistant United States Attorney
United States Attorney's Office
300 Virginia Street, East, Room 4000
Charleston, WV  25301
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: steve.horn@usdoj.gov

OF COUNSEL:

JENNIFER ABRAMSON
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 3 (3RC50)
1650 Arch Street
Philadelphia, PA 19103-2029

FOR THE STATE OF WEST VIRGINIA

/s/ Jason Wandling
JASON WANDLING (WVSB 9259)
State of West Virginia
Department of Environmental Protection Services
Office of Legal Services
601 57th St. SE
Charleston, WV 25304
Phone: (304) 926-0499
Fax: (304) 926-0461
Email: jason.e.wandling@wv.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 6, 2018, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system and that I served the foregoing on counsel for Felman Production, LLC listed below by U.S. Mail and e-mail pursuant to Paragraph 121 of the Consent Decree lodged concurrently with this Complaint.

Laura K. McAfee
201 North Charles Street
Suite 2210
Baltimore, MD 21201-4150
Phone: (410) 230-1330
lmcafee@bdlaw.com

*Counsel for Defendant Felman Production, LLC*

/s/ Alexandra B. Sherertz_____
ALEXANDRA B. SHERERTZ
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 514-0414
Fax: (202) 514-0097
Email: Alexandra.Sherertz@usdoj.gov

*Counsel for the United States*