ENTERED

AUG - 8 2018

RORY L. PERRY II, CLERK
U.S. District Court
Southern District of West Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE STATE OF WEST VIRGINIA,<br><br>Plaintiffs,<br><br>v.<br><br>FELMAN PRODUCTION, LLC<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO.: 3:18-cv-01003<br>)<br>)<br>)<br>)<br>) |

**AMENDED CONSENT DECREE**

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ................................................................................. 3

II.     APPLICABILITY ................................................................................................... 3

III.    DEFINITIONS ........................................................................................................ 5

IV.     CIVIL PENALTY .................................................................................................. 10

V.      COMPLIANCE REQUIREMENTS ...................................................................... 11

VI.     REPORTING REQUIREMENTS ......................................................................... 50

VII.    STIPULATED PENALTIES ................................................................................. 53

VIII.   FORCE MAJEURE .............................................................................................. 58

IX.     DISPUTE RESOLUTION .................................................................................... 60

X.      INFORMATION COLLECTION AND RETENTION ......................................... 62

XI.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ............................. 65

XII.    COSTS .................................................................................................................. 66

XIII.   NOTICES .............................................................................................................. 67

XIV.    EFFECTIVE DATE .............................................................................................. 68

XV.     CERTIFICATION ................................................................................................ 69

XVI.    RETENTION OF JURISDICTION ...................................................................... 69

XVII.   MODIFICATION .................................................................................................. 69

XVIII.  TERMINATION ................................................................................................... 70

XIX.    PUBLIC PARTICIPATION ................................................................................. 70

XX.     SIGNATORIES/SERVICE ................................................................................... 71

XXI.    INTEGRATION .................................................................................................... 71

XXII.   FINAL JUDGMENT ............................................................................................ 72

i

Plaintiffs United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and the State of West Virginia, on behalf of the West Virginia Department of Environmental Protection ("WVDEP") (together "Plaintiffs"), filed a Joint Complaint seeking injunctive relief and civil penalties pursuant to Section 113(b) of the Clean Air Act ("CAA" or the "Act"), 42 U.S.C. § 7413(b), alleging that Defendant, Felman Production, LLC, violated Title V of the CAA, 42 U.S.C. §§ 7661 to 7661f, the emission standards codified at 40 C.F.R. Part 63, Subpart XXX ("Ferroalloys MACT"), and the federally-approved West Virginia State Implementation Plan ("West Virginia SIP"), including regulations codified under Title 45, Series 7 of the West Virginia Code of State Regulations, under the authority of Section 110 of the Act, 42 U.S.C. § 7410, at its silicomanganese production facility located at 4442 Graham Station Road, Letart, Mason County, West Virginia (the "Facility"). Specifically, the Complaint against Defendant alleges that Defendant violated provisions of its operating permit issued pursuant to Title V of the Act ("Title V Permit"), as well as the Ferroalloys MACT and the West Virginia SIP. The Complaint alleges that Defendant (1) failed to establish parameter values in an initial Shop Building opacity compliance test for Furnace No. 2 in violation of Condition 4.2.3.b of its Title V Permit, the Ferroalloys MACT (40 C.F.R. § 63.1656(d)), and Section 502 of the CAA (42 U.S.C. § 7661a); (2) failed to demonstrate continuing compliance with the Shop Building opacity standard in violation of Condition 4.2.3.c. of its Title V Permit, the Ferroalloys MACT (40 C.F.R. § 63.1656(d)), and Section 502 of the CAA (42 U.S.C. § 7661a); (3) failed to operate in a manner consistent with good air pollution control practices that minimize emissions in violation of the general provisions of the National Emission Standards for Hazardous Air Pollutants for Source Categories (40 C.F.R. § 63.6(e)(1)(i)); (4) emitted air pollutants from the Facility's Shop Building in excess of the opacity limits in violation of its

1

Title V Permit (Conditions 4.1.1 and 5.1.1), the West Virginia SIP (W. Va. Code R. §§ 45-7-3.1 and 45-7-3.2), and Section 502 of the CAA (42 U.S.C. § 7661a); and (5) operated the Facility without a system to minimize the emissions of fugitive air pollutants from the Shop Building in violation of its Title V Permit (Conditions 3.1.8 and 4.1.6), the West Virginia SIP (W. Va. Code R. § 45-7-5), and Section 502 of the CAA (42 U.S.C. § 7661a). On January 4, 2013, EPA Region III issued a Notice of Violation to Defendant alleging the violations described in the Complaint.

On February 20, 2015, WVDEP issued a Notice of Violation to Defendant alleging that Defendant emitted air pollutants from the Facility's Shop Building in excess of the opacity limits in violation of its Title V Permit (Conditions 4.1.1 and 5.1.1) and the West Virginia SIP (W. Va. Code R. §§ 45-7-3.1 and 45-7-3.2).

The United States has reviewed Financial Information regarding Defendant and has determined that Defendant has a limited ability to pay a civil penalty in this matter.

Defendant disputes the allegations in the Complaint and does not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the Complaint and Notice of Violation ("NOV").

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Sections I and II, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.   JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and Section 113(b) of the Act, 42 U.S.C. § 7413(b), and over the Parties. Venue lies in this District pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and Defendant conducts business in, this judicial district. For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree and any such action and over Defendant and consents to venue in this judicial district.

2.      For purposes of this Consent Decree, Defendant agrees that the Complaint filed pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), states claims upon which relief may be granted pursuant to Section 502 of the Act (42 U.S.C. § 7661a), the Ferroalloys MACT (40 C.F.R. § 63.1656(d), 40 C.F.R. § 63.6(e)(1)(i)), and the West Virginia SIP (40 C.F.R. Part 52 Subpart XX, including W. Va. Code R. §§ 45-7-3.1, 45-7-3.2, and 45-7-5).

## II.   APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States and the State, and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

4.      At least thirty (30) Days prior to any proposed transfer of majority ownership or operation of the Facility, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall provide written notice of the prospective transfer, together with a copy of the proposed written agreement, and the anticipated date of transfer to EPA Region III, the United States Attorney for the Southern District of West Virginia, and the United States Department of

3

Justice, in accordance with Section XIII (Notices). This notification shall also include a description of both the current and anticipated future Consent Decree Compliance Requirements and activities, if known, that remain to be performed at any portion of the Facility to be transferred. Defendant shall remain obligated and responsible for the requirements of this Consent Decree, unless (i) the transferee agrees to undertake the obligations required by this Consent Decree and to be substituted for Defendant as a party under this Consent Decree and thus bound by the terms hereof, and (ii) the United States and WVDEP consent to relieve Defendant of its obligations through the process set forth in this Paragraph, which consent shall not be unreasonably withheld. Defendant shall condition any transfer upon agreement by the purchaser or transferee to take whatever actions are necessary to permit Defendant to fulfill its obligations under this Consent Decree and to submit to the jurisdiction of this Court. The existence of this Consent Decree, and the fact that this Decree will apply to and bind Defendant and the transferee, shall be noted in any agreement between Defendant and any party to whom any legal or equitable interest in all or any portion of the Facility is being transferred prior to termination of this Decree. It shall be a condition of any such transfer that the transferee(s) execute a document agreeing to be bound by the provisions of this Consent Decree and submitting to the jurisdiction of this Court. Any attempt to transfer majority ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

5.     Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree.

4

Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree, except as provided in Section VIII (Force Majeure), below.

## III.  DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Casting Station" shall mean a station where molten metal Silicomanganese ("SiMn") is poured from a ladle into molds (also called nests), where it then solidifies before proceeding to further processing;

"Charging" shall mean the addition of raw materials into the electric arc furnace;

"Complaint" shall mean the complaint filed by the United States and the State in this action;

"Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto;

"Date of Lodging" shall mean the date this Decree is first filed with the Court;

"Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day;

5

"Defendant" shall mean Felman Production, LLC;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XIV;

"Electrode columns" shall mean the vertical columns on the electric arc furnace;

"Exhaust Ventilation System" shall mean the equipment including, but not limited to, hoods, ducts, fans, air cleaning devices, and stacks, used to capture and/or transport particulate matter, gasses, or emissions generated at operations within the Shop Building;

"Facility" shall mean Defendant's silicomanganese production facility located at 4442 Graham Station Road, Letart, Mason County, West Virginia;

"Ferroalloys MACT" or "Ferroalloys Maximum Achievable Control Technology" shall mean the National Emission Standards for Hazardous Air Pollutants for Ferroalloys Production as codified at 40 C.F.R. Part 63, Subpart XXX, effective May 20, 1999, as amended on March 22, 2001, unless otherwise indicated;

"Financial Information" shall mean 2012-2015 audited financial statements, federal income tax returns, January-November 2016 monthly unaudited financial statements, business descriptions and prospects for 2016; financial projections, group corporate charts; an operating agreement; and a revolving credit agreement;

"Fugitive emissions" shall mean emissions from sources in the Shop Building that escape capture;

"Fume seal" shall mean an engineering control comprised of a water jacketed circular seal to prevent hot furnace gases from escaping the furnace between the fixed furnace roof and the moving furnace electrodes;

6

"Furnace Charge" shall mean the material melted in the furnace. The primary components include, but are not limited to, ore, fluxes, reductants, quartz, briquetted SiMn fines, and baghouse dust pellets;

"Furnace Exhaust" shall mean the process exhaust extracted from the furnace at the Facility;

"General Exhaust Ventilation System" shall mean an exhaust ventilation system that utilizes capture hoods that are remote from specific sources of emissions;

"Local Exhaust Ventilation System" shall mean an exhaust ventilation system that utilizes close capture hoods at or near a source of emissions;

"Make-up Floor" shall mean the upper floor in the Shop Building, above the Well Floor, where Furnace Charge is made up and fed into the furnace, electrode additions are made, and other activities are performed;

"Paragraph" shall mean a portion of this Decree identified by an Arabic numeral;

"Parties" shall mean the United States, the State, and Defendant;

"Plaintiffs" shall mean the United States and the State of West Virginia;

"Pour Fan" shall mean the fan that exhausts the casting and/or pouring operation;

"Pouring" shall mean the transfer of molten Silicomanganese ("SiMn") from a ladle into molds (also called nests) at the casting station, where it solidifies before preceding to further processing (see also definition of "Casting");

"Pressurization Project" shall mean the enclosing of the Well Floor on Furnace No. 2 at the Facility and pressurizing the enclosure with air drawn from outside the building to prevent the escape of contaminants from the enclosure. This project has been completed on Furnace No. 2 prior to the Date of Lodging of this Consent Decree;

"Raking" or "Ladle Raking" shall mean the practice of manually drawing off solid, or semi-solid slag, from the top of a ladle at the skimming station;

"Root Cause Analysis" shall mean the process of determining the reason and/or cause of the Facility's exceedance of one or more of its operating parameters or its noncompliance with the applicable opacity standard, an analysis of remedial measures available to reduce the likelihood of recurrence of such events, and a recommendation of remedial measure(s) to be implemented.

"Section" shall mean a portion of this Decree identified by a Roman numeral;

"Shop Building" shall mean the building that houses one or more submerged arc furnaces at the Facility;

"Shop Building Opening" shall mean any aperture or gap including, but not limited to, windows, doors, and roof openings in the Shop Building where visible fugitive emissions may escape the Shop Building;

"SIP" or "State Implementation Plan" shall mean the federally-approved West Virginia State Implementation Plan at 40 C.F.R. Part 52, Subpart XX, including the regulations at Title 45, Series 7 of the West Virginia Code of State Rules;

"Skimming" shall mean the pouring of molten, solid, or semi-solid slag, with some molten metal, from a ladle of molten metal into another container (referred to as a "slag pot") prior to third-party processing of the slag. Skimming is a purification step between tapping and casting;

"Skimming hood" shall mean an exhaust hood at the skimming operation;

"Slag" shall mean the molten, solid, or semi-solid byproduct of Defendant's Silicomanganese production process;

8

"Smelting" shall mean the pyrometallurgical conversion of raw materials into Silicomanganese in an electric arc furnace;

"State" shall mean the State of West Virginia;

"Stoking Floor" shall mean the floor at the Facility surrounding the barrel of the furnace and enclosing the opening(s) through which the furnace charge is worked;

"Supply Ventilation System" shall mean the equipment usually including, but not limited to, air intakes, ducts, and fans, used to replace air exhausted by exhaust ventilation systems or to pressurize rooms or areas for the purpose of controlling particulate matter, gasses, or emissions generated at operations within the Shop Building;

"Tapping" shall mean the removal of product from the electric arc furnace under normal operating conditions, such as removal of metal under normal pressure and movement by gravity down the spout into the ladle and filling the ladle;

"Tap Hole Fan" shall mean the fan that exhausts the furnace tapping operation at the Facility;

"Title V Permit" shall mean Defendant's Renewed Title V Permit R30-05300004-2013 effective April 9, 2013 through March 26, 2018, issued to Defendant by the State of West Virginia pursuant to Section 502 of Title V of the Act, 42 U.S.C. § 7661a, as well as Defendant's Title V Permit R30-0530004-2007 effective August 22, 2007 through August 8, 2012;

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA, and successors thereto;

"Well Floor" also known as the "Service Floor" shall refer to the floor directly above the furnace roof at the Facility. This is the floor above the Stoking Floor;

"Work Plan" shall mean the engineering plan developed by a Professional Engineer to address all sources of emissions at the Facility in accordance with the requirements of Paragraphs 21 through 30.

## IV.  CIVIL PENALTY

8.      Within thirty (30) Days after the Effective Date, Defendant shall pay the sum of $100,000 to the United States as a civil penalty, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the Date of Lodging.

9.      Defendant shall pay the civil penalty due pursuant to Paragraph 8 by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account, in accordance with the instructions provided to Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Southern District of West Virginia thirty (30) Days after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendant shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Adam Thatcher
> Plant Manager
> Felman Production, LLC
> 4422 Graham Station Road
> Letart, WV 25253

on behalf of Defendant. Defendant may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States, EPA, and to the United States Attorney for the Southern District of West Virginia accordance with Section XIII (Notices).

10

At the time of payment, Defendant shall send notice that payment has been made: (i) to

EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance

Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to the United States via

email or regular mail in accordance with Section XIII (Notices); and (iii) to EPA in accordance

with Section XIII (Notices). Such notice shall state that the payment is for the civil penalty

owed pursuant to this Consent Decree in United States v. Felman Production, LLC, and shall

reference the civil action number, the CDCS Number, and DOJ case number 90-5-2-1-10991.

10.     Defendant shall not deduct any penalties paid under this Decree pursuant to this

Section or Section VII (Stipulated Penalties) in calculating its federal or State or local income

tax.

11.     No later than thirty (30) Days after the Effective Date, Defendant shall pay a civil

penalty of $100,000 to the State of West Virginia and delivered by check payable to the Air

Pollution Education and Environment Fund and shall be sent to the Division of Air Quality,

Attention: William F. Durham, Director, to the address provided in Section XIII (Notices). The

payment shall be accompanied by notice to the WVDEP Division of Air Quality ("DAQ") that

the payment is for the civil penalty owed pursuant to the Consent Decree in United States v.

Felman Production, LLC, and shall reference the civil action number.

## V.   COMPLIANCE REQUIREMENTS

12.     General Opacity and Emission Limit Requirements: On and after the Date of

Lodging of this Consent Decree, Defendant shall operate the Facility in compliance with the

Ferroalloys MACT and Title 45, Series 7 (W. Va. Code R. 45-7), "To Prevent and Control

Particulate Matter Air Pollution from Manufacturing Processes and Associated Operations,"

effective August 31, 2000. Specifically, Defendant shall not cause, suffer, allow, or permit

11

emission of smoke and/or particulate matter into the open air from any process source operation at the Facility which is greater than twenty (20) percent opacity, except smoke and/or particulate matter emitted from any process source operation which is less than forty (40) percent opacity for any period or periods aggregating no more than five (5) minutes in any sixty (60) minute period pursuant to W. Va. Code R. §§ 45-7-3.1 and 45-7-3.2. Defendant shall at all times operate with a system installed, maintained, and operated to ensure the lowest fugitive particulate matter emissions reasonably achievable pursuant to W. Va. Code R. § 45-7-5.1. Defendant shall at all times, including during periods of startup, shutdown, and/or malfunction, implement good air pollution control practices to control and minimize fugitive emissions.

13.     Compliance with this Consent Decree does not relieve Defendant of its obligations to comply with other currently-applicable laws and regulations or laws and regulations that become applicable or have become applicable to the Facility over the term of this Consent Decree or prior to entry of the Consent Decree, including the Ferroalloys MACT, 40 C.F.R. Part 63, Subpart XXX, effective June 30, 2015, as amended on January 18, 2017; the West Virginia SIP; and the terms of its Title V Permit including any changes thereto.

14.     At the time of lodging of this Consent Decree, Defendant is operating Furnace No. 5 only. Before August 26, 2018, Defendant shall shut down Furnace No. 5 and provide written notices to EPA and to WVDEP within three (3) calendar days of the date Furnace No. 5 is shut down. Defendant shall not commence operating Furnace No. 2 until Furnace No. 5 is shut down, except that Defendant shall be allowed a reasonable time, not to exceed 15 days, prior to August 26, 2018, to restart Furnace No. 2 and achieve normal operating conditions before Furnace No. 5 must be shut down. Under such circumstances, Defendant shall provide written notices to EPA and to WVDEP no later than three (3) calendar days prior to the date Furnace

No. 2 commences operating in accordance with this Paragraph, with such notices specifying the measures taken to operate the Facility in compliance with the Ferroalloys MACT, 40 C.F.R. Part 63, Subpart XXX, effective June 30, 2015, as amended on January 18, 2017. Defendant shall conduct weekly opacity observations of Furnace No. 5 and Furnace No. 2, as applicable, until Defendant conducts the opacity observation required by Paragraph 17. With the exception of the flow meter trial period, all other requirements of this Consent Decree remain in effect and applicable to Furnace No. 5 until it is shut down. In the event that Defendant elects to operate a second furnace during the pendency of this Consent Decree (other than as provided in this Paragraph), it must first comply with the requirements of Paragraphs 48 through 52. Defendant shall implement the following projects for Furnace No. 2 (collectively the "Projects") by August 26, 2018. Defendant shall not commence operation of Furnace No. 2 until the Projects are complete.

    a.    By December 1, 2017, Defendant installed and began operating a secondary capture system in the roofline of the building. This project included the following:

        (1)    Maintaining the closure of the three existing doghouses, and

        (2)    Installing a baghouse, exhaust fan, and stack, with a rated capacity of 105,000 acfm and a nominal 6.1:1 air-to-cloth ratio, to capture and control fugitive emissions from process source operations in the Shop Building, including making any necessary additional modifications to the existing roof and/or building structure.

    b.    By October 31, 2017, Defendant designed and implemented improvements to the Casting Station(s) that, at any time, are used by Furnace No. 2 to

13

improve capture, including, but not limited to, increasing the freeboard of the hood and moving the offtake duct. After these improvements have achieved normal operation, Defendant shall use this Casting Station when casting from Furnace No. 5

c. By March 31, 2018, Defendant shall redesign and replace the fume seals for Furnace No. 2 to minimize emissions from gaps around the electrode columns.

d. By August 26, 2018, Defendant shall complete the enclosure and pressurization of the Service Floor around the furnace, with the enclosure adequate enough to allow servicing of the furnace from inside the enclosure with the doors closed, to minimize and capture emissions that escape from the furnace through the electrode columns.

 (1) Defendant shall develop, maintain, and implement work practices requiring the doors to the enclosure to remain closed except when equipment, personnel, or materials need to be moved into the enclosure, and prohibiting work on the furnace at the Service Floor to be conducted when the doors are open.

 (2) Defendant acknowledges the need to comply with Occupational Safety and Health Administration (OSHA) regulations.

 (3) Defendant shall submit to EPA and WVDEP a report containing the work practices in Subparagraph (1) within thirty (30) Days of the date the project in Subparagraph (d) is completed.

e. By March 31, 2018, Defendant shall complete repairs to ductwork for all

14

process source operations associated with the operation of Furnace No. 2 to improve flow to the baghouses, reduce pressure drops across the ventilation system, and eliminate leaks in the ductwork.

15.     Defendant shall conduct a test (the "Trial Period") to evaluate the reliability, accuracy, and durability of flow meters to be used to monitor volumetric flow in the Facility's exhaust ventilation system. The Trial Period shall commence on the date that Furnace No. 2 commences operation and shall continue for one-hundred twenty (120) consecutive Days (e.g., August 26, 2018 through December 24, 2018). The Trial Period shall be conducted as follows:

a.      Prior to the date Furnace 2 commences operation, Defendant shall install, calibrate, and maintain:

(1)     A flow meter in the nominal 48-inch duct for the Furnace No. 2 Tap Hole Hood. The flow meter shall be located at or near the ventilation ports installed during the 2015 ventilation monitoring.

(2)     A flow meter in the nominal 60-inch duct for the Furnace No. 2 Casting Hood. The flow meter shall be located at or near the ventilation ports installed during the 2015 ventilation monitoring.

(3)     A flow meter in the main duct for the Furnace No. 2 exhaust. The flow meter shall be located at or near Tower No. 3 shown on the American Air Filter drawing GF-60372-4, Baghouse No. 2 Main Duct details.

b.      Prior to installation of the flow meters, Defendant shall consult with vendors regarding the appropriate flow meter make and model for the Facility. Defendant shall obtain vendor information representing that the

15

flow meters selected for the Trial Period are designed to withstand the temperatures and dust loadings at the Furnace No. 2 exhaust system. The selected flow rate monitoring devices must meet the requirements in 40 C.F.R. § 63.1626(h)(3).

c.      At or before the time of installation, Defendant shall provide EPA and WVDEP with a report containing a description of the flow meters, Defendant's description of the operating conditions of the Facility and Furnace No. 2 exhaust system provided to the flow meters' manufacturer, the specifications for the flow meters, copies of the flow meters' installation and operation manuals, copies of the manufacturer's quotes for the flow meters, and copies of any manufacturer guarantee of performance provided by the manufacturer.

d.      Prior to the commencement of the Trial Period, Defendant shall retain a testing company (e.g., the manufacturer of the flow meters), to calibrate the flow meters in accordance with the manufacturer's calibration specifications. If not included in the calibration procedure, the testing company shall also calibrate, or verify calibration of, the meters with a pitot traverse as described in Method 2. The pitot traverse shall verify flow meter output and the actual flow (as determined by the pitot traverse) under at least the following conditions:

(1)      Verify the flow meter in the main duct described in Paragraph 15.a(3) under at least four operating conditions, e.g., (a) normal operation with all compartments of the baghouse

16

operating (all bullseye dampers closed), (b) normal operation with one compartment off line for cleaning and the reverse fan off, (c) normal operation with one compartment off line for cleaning and the reverse fan operating, and (d) normal operation with all compartments of the baghouse operating and the Tap Hole Fan operating at full capacity.

(2)      Verify the flow meter of the tap hole hood duct described in Paragraph 15.a(1) under at least two conditions: (a) the tap hole fan operating and (b) the tap hole fan off.

(3)      Verify the flow meter of the pour (casting) hood duct described in Paragraph 15.a(2) under at least two conditions: (a) the pour fan operating and (b) the pour fan off.

e.      During the opacity observation required to be conducted by October 20, 2018 pursuant to Paragraph 17 to demonstrate compliance with the opacity standard specified in Paragraph 12, Defendant shall establish a minimum volumetric flow rate parameter value for each flow meter, for each significant phase of the operation including, but not limited to: smelting, tapping, and pouring, over the duration of a full furnace process cycle. A full furnace process cycle is the time when the furnace is tapped to the time when the furnace is tapped again, and includes all the periods of charging, smelting, tapping, casting, and ladle raking for the furnace.

f.      During the Trial Period, Defendant shall continuously monitor and record volumetric flow through each flow meter. Defendant shall also record the

17

date, time, and monitored volumetric flow rate whenever the monitored

volumetric flow rate is less than the respective parameters established. At

all times during the Trial Period, Defendant shall check and record the

control system fan motor amperes and capture system damper positions

once per shift in accordance with 40 C.F.R. § 63.1626(h)(1)(i) and shall

report these values for MACT compliance purposes.

g.     Defendant shall follow the flow meter manufacturer's recommended

maintenance of the flow meters.

h.     At or before the end of the Trial Period, Defendant shall retain the flow

meter vendor or manufacturer to assess the flow meters for damage and

accuracy in the manner and location recommended by the flow meter

vendor or manufacturer. The flow meter vendor or manufacturer shall: (i)

check the flow meters' calibration by conducting pitot traverse in

accordance with the procedure specified in Paragraph 15.d; (ii) assess the

reliability of the flow meter by comparing the results of the two pitot

traverse calibrations and evaluating any performance issues over the

course of the Trial Period; and (iii) evaluate the durability of the flow

meter, including assessing any necessary maintenance or repairs.

Defendant shall submit a report containing these analyses to EPA and

WVDEP within thirty (30) days after receiving the flow meter vendor or

manufacturer's assessment, but no later than sixty (60) days after the end

of the Trial Period.

(1)    Within thirty (30) days after submission of the test results,

18

Defendant shall use all of the data and testing obtained during the Trial Period to assess the performance and reliability of the flow meter and submit a Performance and Reliability Report to EPA and WVDEP. If Defendant determines that the data and reliability testing demonstrate that the flow meter has provided accurate readings and maintained sufficient reliability in the operating environment, Defendant shall notify EPA and WVDEP of this determination in the Performance and Reliability Report. The Performance and Reliability Report shall specify that Defendant will install an additional two flow meters (for a total of five), one on each separately ducted hood that comprises the capture system associated with Furnace No. 2, as shown on Appendix A, and identify any additional locations, if applicable, where Defendant will install flow meters. Defendant shall further:

(a)     Within thirty (30) Days of submitting the Performance and Reliability Report, install and maintain the flow meters in the locations identified above in accordance with the requirements of 40 C.F.R. Part 63, Subpart XXX (2015 ed.) and in accordance with the flow meter manufacturer's maintenance and operational recommendations. Within forty-five (45) Days of submitting the Performance and Reliability Report, Defendant shall calibrate the flow meters using the methods and procedures identified in

19

Paragraph 15.d(1)-(3).

(b)     Within sixty (60) Days of submitting the Performance and Reliability Report, establish parameter values for volumetric flow through the flow meters in accordance with 40 C.F.R. § 63.1625(d)(2)(i). The parameter values shall be established during an opacity observation conducted in accordance with the requirements of Paragraph 17 to demonstrate compliance with the opacity standard specified in Paragraph 12. Defendant shall establish minimum volumetric flow rate parameter values for each flow meter for each significant phase of the operation including, but not limited to: smelting, tapping, and pouring for the flow meter over the duration of a full furnace process cycle. A full furnace process cycle is the time when the furnace is tapped to the time when the furnace is tapped again, and includes all the periods of charging, smelting, tapping, casting, and ladle raking for the furnace.

(c)     Within thirty (30) Days of establishing the parameter values for the flow meters as described in Paragraph 15.i(1)(b), submit them to EPA and WVDEP, and apply to WVDEP for a modification of its Title V Permit to incorporate the parameter values in accordance with

Paragraph 58.

(d)     At any time after the conclusion of the Trial Period and submission of the Performance and Reliability Report, if Defendant experiences operational or maintenance problems with the flow meters that demonstrate that the flow meters are no longer providing accurate readings or maintaining sufficient reliability in the operating environment, Defendant shall, within fourteen (14) Days after the specific event that causes the Facility to conclude that the flow meters are unreliable, petition EPA and WVDEP to authorize an alternative monitoring method. Defendant's Petition shall (i) describe the basis for this conclusion, (ii) set forth the analysis and documentation supporting this conclusion, and (iii) identify an alternative monitoring approach that Defendant proposes to implement to ensure consistent compliance with the limits identified in Paragraph 12 in accordance with the requirements of 40 C.F.R. § 63.1626(h). Defendant shall seek any permit amendment required by the petition for an alternative in accordance with Paragraph 58.

(2)     If Defendant's data and reliability testing demonstrate that the flow meters did not provide accurate readings or maintain

21

sufficient reliability in the operating environment, the Performance and Reliability Report shall (i) describe the basis for this conclusion, (ii) set forth the analysis and documentation supporting this conclusion, and (iii) identify an alternative monitoring approach that Defendant proposes to implement to ensure consistent compliance with the limits identified in Paragraph 12 in accordance with the requirements of 40 C.F.R. § 63.1625(d)(2)(i). Defendant shall implement the monitoring identified in this report unless and until EPA, in consultation with WVDEP, make a determination pursuant to Paragraph 15.i(2)(a).

(a)     EPA and WVDEP shall review the Performance and Reliability Report upon submission. If EPA and WVDEP disagree with Defendant's conclusion, they shall notify Defendant of this determination. The determination of EPA and WVDEP shall be final, subject to Defendant's rights to invoke Dispute Resolution pursuant to Section IX. If Defendant consents to EPA and WVDEP's determination, Defendant shall comply with Paragraph 15.i(1) and install the flow meters within thirty (30) days after the issuance of this determination. If Defendant invokes Dispute Resolution, Defendant shall continue to implement the monitoring proposed in its Performance and Reliability Report in accordance with 40 C.F.R. §

22

63.1626(h) pending the conclusion of the Dispute

Resolution process.

(b)     Consistent with the outcome of the Dispute Resolution

process, to the extent not already established, Defendant

shall submit parameter value ranges to be monitored for

demonstrating continuous compliance with the opacity

standard specified in Paragraph 12 to EPA and WVDEP

within thirty (30) Days of establishing the parameters, and

shall apply to WVDEP within thirty (30) Days for a

modification of its Title V Permit to incorporate the

parameter value ranges in accordance with Paragraph 58.

16.     Within thirty (30) Days after the Effective Date, Defendant shall submit to EPA

and WVDEP (i) a report identifying the status of each of the projects outlined in Paragraph 14.a-

14.e and all parts of Paragraph 15, and (ii) a schedule for the completion of the remaining

projects by June 30, 2018, including enforceable milestones subject to Section VII (Stipulated

Penalties).

17.     Opacity Observation: Defendant has conducted an opacity observation to demonstrate

compliance with the West Virginia SIP prior to November 15, 2017 on Furnace No.5. After Defendant shuts

down Furnace No. 5 and commences operation of Furnace No. 2, Defendant shall conduct opacity observations

on Furnace No. 2 by October 20, 2018, and after the completion of the Trial Period. This Paragraph does not

alter the compliance demonstration requirements for other emissions limits under the Ferroalloys MACT, which

shall be conducted as set forth in the Ferroalloys MACT, 40 C.F.R. Part 63, Subpart XXX, effective June 30,

2015, as amended on January 18, 2017, and the Administrative Compliance Order by Consent between

23

Defendant and EPA (July 10, 2017). All three opacity observations required under this Paragraph, as well as opacity observations required by Paragraphs 30 and 50, shall be conducted in accordance with 40 C.F.R. § 63.1625(d) with the furnace operating at least at 80% of the design capacity, and under normal process operations to demonstrate compliance with applicable opacity standards. Such opacity observations shall be conducted on air pollution control devices as well as vent stacks for emissions sources located in the Shop Building associated with the operation of the tested furnace that are subject to opacity standards, and shall be conducted over a full furnace process cycle. A full furnace process cycle is the time when the furnace is tapped to the time when the furnace is tapped again, and includes all the periods of charging, smelting, tapping, casting, and ladle raking for the furnace. At the time of each opacity observation required by this Paragraph, as well as opacity observations required by Paragraphs 30 and 50, Defendant shall:

a.  <u>During the November 2017 Opacity Observation:</u> Defendant established parameter value ranges for control system fan amperes and capture system damper positions pursuant to 40 C.F.R. § 63.1625(d)(2)(i). Defendant shall maintain and monitor parameter values for control system fan amperes and capture system damper positions until parameter values for volumetric flow rate through each hood for the flow meters are established and incorporated into Defendant's Title V Permit.

b.  <u>During the Opacity Observation Completed by October 20, 2018:</u> Establish valid parameter values for minimum volumetric flow rates through each hood pursuant to Paragraph 15(e), and parameter value ranges for control system fan amperes and capture system damper positions pursuant to 40 C.F.R. § 63.1625(d)(2)(i), to be monitored during the Trial Period. Defendant shall maintain and monitor parameter

24

values for control system fan amperes and capture system damper positions, and use these values to determine its compliance with the Ferroalloys MACT, 40 C.F.R. Part 63, Subpart XXX, effective June 30, 2015, as amended on January 18, 2017, until parameter values for volumetric flow rate through each hood for the flow meters are established and incorporated into Defendant's Title V Permit.

c.   <u>During Post-Trial Period Opacity Observations:</u> Establish valid parameter values for minimum volumetric flow rates through each hood for the flow meters pursuant to Paragraph 15.i(1)(c), or parameter value ranges for Defendant's alternative method pursuant to 40 C.F.R. § 1625(d)(2), to be monitored following the Trial Period. Pursuant to Paragraph 15.i(1)(c), within thirty (30) Days of establishing the parameter values for the flow meters, Defendant shall apply to WVDEP for a modification of its Title V Permit to incorporate the parameter values.

18.   For purposes of this Consent Decree, the parameter values established under any provision in Paragraph 17 shall not be valid unless the applicable opacity observation is conducted either (i) during a performance test conducted pursuant to 40 C.F.R. § 63.1625(a)-(c), or (ii) at an operating capacity (measured as a percentage of design capacity) that is no more than two percentage points less than the capacity at which the furnace operated during a previously passing performance test conducted pursuant to 40 C.F.R. § 63.1625(a)-(c), for the respective furnace for which the parameter values are established.

19.   With the exception of the November 2017 test, Defendant shall notify EPA and

25

WVDEP at least thirty (30) Days prior to the tests referenced in Paragraph 17. This notification shall include the actual date and time during which the test(s) will be conducted, the visual emissions reading procedure (including the proposed locations of the Method 9 observations), the opacity observation protocol that will be used during the test(s), and verification that the test(s) will fully conform to the applicable testing and observation standards. If weather conditions prevent the completion of the opacity observation on the scheduled date, Defendant shall provide EPA and WVDEP with at least five (5) business Days advance notice of the rescheduled date. In their discretion, EPA and/or WVDEP may attend the test.

20.     Defendant shall submit a report of the results of the opacity observations performed pursuant to Paragraph 17 within thirty (30) Days of completion of each opacity observation. Each test report shall provide the information necessary to document the objectives of the test and to determine whether proper procedures were used to accomplish these objectives as specified in Paragraph 17. The report shall include the following: the underlying opacity observation data sheets, the parameter value(s) established during the opacity observations; a statement of compliance status with the requirements set forth in Paragraph 12, signed by a responsible official; documentation verifying that the observations conformed with applicable opacity observation protocols; and documentation of how the furnace was operated (in tons per hour).

21.     If Defendant (a) fails to demonstrate compliance with the requirements of Paragraph 12 in the opacity observation performed by October 20, 2018 pursuant to Paragraph 17, or (b) is issued a NOV by EPA or WVDEP for violation(s) of the opacity standard specified in Paragraph 12 after the completion of the projects required by Paragraph 14,

26

Defendant shall retain a certified Professional Engineer within thirty (30) Days after receipt of the final test report or NOV (as applicable) to evaluate additional available fugitive emissions controls at the Facility.

22.     Defendant shall include in its contract with the Professional Engineer all of the conditions and requirements listed in Subparagraphs 22.a- .e.

a.      The Professional Engineer shall have expertise in environmental compliance and with the federal CAA, designing industrial ventilation systems, and control of pyrometallurgical processes. The Professional Engineer shall have specific knowledge of 40 C.F.R. Part 63, Subpart XXX and the West Virginia SIP, or shall become familiar with the requirements of 40 C.F.R. Part 63, Subpart XXX and the West Virginia SIP.

b.      It shall be Defendant's obligation to ensure that the Professional Engineer has full access to, and unrestricted review of, any of Defendant's records, documents, and information that will assist the Professional Engineer in determining Defendant's current compliance with the Ferroalloys MACT, the West Virginia SIP, and Defendant's Title V Permit. It shall also be Defendant's obligation to ensure that the Professional Engineer has full access to, and unrestricted review of, any of Defendant's records, documents, and information that will assist the Professional Engineer in determining the pollution-control measures and/or operational measures Defendant must implement to achieve compliance with the

27

Ferroalloys MACT, the West Virginia SIP, and Defendant's Title V permit. Defendant shall provide the Professional Engineer with a copy of this Consent Decree and its Title V Permit.

c.    The Professional Engineer shall perform at least one on-site inspection at the Facility, and shall have access to all units, areas, equipment, and structures at the Facility during the inspection, and at all other times during normal operating hours. Defendant shall provide EPA and WVDEP with written notice of the date and time of the Professional Engineer's inspection at least five (5) Days prior to such inspection. In their discretion, EPA and/or WVDEP may accompany the Professional Engineer during the inspection.

d.    The Professional Engineer shall observe and review the Facility's operations, including parametric operating and monitoring records and maintenance procedures at the Facility, and may request that testing, sampling, or other procedures be performed as needed to determine Defendant's present compliance with the CAA, including 40 C.F.R. Part 63, Subpart XXX, the West Virginia SIP, and the Facility's Title V Permit.

e.    The Professional Engineer shall evaluate and recommend measures necessary for Defendant to comply with the provisions of this Consent Decree.

23.    It shall be Defendant's obligation to ensure that the Professional Engineer independently evaluates all sources of process fugitive emissions at the Facility, including, but

not limited to, fugitive emissions associated with the following: (a) casting (pouring) at Casting Stations, (b) Tapping (c) Skimming, (d) furnace exhaust ventilation, (e) General Exhaust Ventilation System at the Shop Building roof line, (f) the Well Floor, and (g) the Make-up Floor.

24.     It shall be Defendant's obligation to ensure that the Professional Engineer considers the specific measures included in Paragraph 26.a-26.g, except as set forth in Paragraph 25.

25.     The Professional Engineer shall make recommendations in a Work Plan based on its evaluation of the Projects in Paragraph 26.a-26.g, except as set forth in Paragraph 27. The Work Plan shall include a discussion of each of the measures identified in Paragraph 26.a-26.g, including an evaluation of whether these measures are necessary and appropriate for the Facility to comply with the requirements of this Consent Decree, considering their overall effectiveness at capturing and/or reducing fugitive emissions, cost, feasibility, and the success or failure of prior comparable efforts, including measures incorporated in other industries with a large electric arc furnace ("EAF"). For measures identified in Paragraph 26.a-26.g which are not included in the Work Plan, the Professional Engineer shall include alternative recommendations, or explain why no alternative recommendation is appropriate for the measure.

26.     The Professional Engineer shall evaluate the following Projects in the Work Plan in accordance with Paragraph 25, except as set forth in Paragraph 27:

    a.     Casting (Pouring). For each Casting Station:

        (1)     Redesign hood(s) and ductwork to improve capture and prevent leakage;

        (2)     Increase volumetric flow to improve capture;

29

     (3)       Address fume escape from casting nests while pouring;

     (4)       Address dust generated while preparing nests and removing cast material from nests;

     (5)       Modify duct system (to accommodate new hood(s), duct, and baghouse) and maintain the system to prevent leaks; and

     (6)       Install new dedicated baghouse and fan exclusively for casting operations for capture and control of fugitive emissions during the totality of activities associated with the casting station including, but not limited to: nest (mold) preparation, pouring, off gassing that occurs while the molten material cools, and removal of the solidified material from the nests (molds).

b.    Tapping:

     (1)       Redesign tap hole hood;

     (2)       Increase volumetric flow at the hood;

     (3)       Disconnect tapping hood from furnace baghouse;

     (4)       Add local exhaust ventilation at ladles for capture and control of fugitive emissions; and

     (5)       Provide a new dedicated baghouse and fan exclusively for tapping operations.

c.    Skimming:

     (1)       Modify skimming hood;

     (2)       Provide local exhaust ventilation for capture and control of

fugitive emissions;

    (3)    Capture fugitive emissions associated with handling of the solidified slag/metal mixture skimmed; and

    (4)    Include a new dedicated baghouse exclusively for skimming operations for capture and control of fugitive emissions.

d.    Furnace Exhaust Ventilation System:

    (1)    Disconnect tap hole fan (serving the tap hole and the pouring station) from furnace baghouse;

    (2)    Disconnect pour fan from furnace baghouse;

    (3)    Reduce leakage in furnace Exhaust Ventilation System; and

    (4)    Increase volumetric flow at the furnace hood.

e.    General Exhaust Ventilation System Near Roof Line:

    (1)    Provide additional general exhaust ventilation at the Shop Building roof line including, but not limited to, installation of associated ductwork and additional local or a General Exhaust Ventilation System.

f.    Well Floor:

    (1)    Evaluate the effectiveness of Defendant's Pressurization Project on Furnace No. 2.

        (a)    If the Work Plan provides that the Pressurization Project's design is not sufficiently effective at capturing and/or reducing fugitive emissions, evaluate alternative measures to address emissions at Furnace No. 2. The Work Plan shall

31

consider the following: (1) change the approach from pressurization of the enclosure to exhausting the enclosure, and (2) design and install a new Exhaust Ventilation System that discharges through a baghouse and includes local exhaust ventilation.

(b)     If the Work Plan requirements of this Consent Decree are triggered by the startup of a second furnace, and if the Professional Engineer determines that the Pressurization Project's design is effective at Furnace No. 2 for capturing and/or reducing fugitive emissions, the Work Plan shall, in addition, further consider implementing a similar pressurization-project design on the second furnace, including the measures to address the leakage of fugitive emissions during personnel and equipment access.

g.     Make-up Floor:

(1)     The Work Plan shall evaluate the effectiveness of Defendant's project of creating a ventilated enclosure ("Ventilated Enclosure Project") on the Furnace No. 2 Make-up Floor (which project has been started but not yet completed prior to the Date of Lodging this Consent Decree).

(a)     If the Professional Engineer determines that the Ventilated Enclosure Project is not sufficiently effective at capturing and/or reducing fugitive emissions or not

32

cost- effective, the Work Plan shall evaluate alternative measures to address emissions, including: (1) increase exhaust ventilation volumetric flow, (2) local exhaust ventilation at major sources inside the enclosure, and (3) provide local exhaust ventilation to control emissions from the new material handling system for the charge feed, required by Defendant to be completed pursuant to Paragraph 14.

(b)     If the Work Plan requirements of this Consent Decree are triggered by the startup of a second furnace, and if the Professional Engineer determines that the Ventilated Enclosure Project is effective at capturing and/or reducing fugitive emissions, the Work Plan shall consider implementation of a similar ventilated enclosure on the second furnace.

27.     If any opacity observation failure or NOV identified in Paragraph 21 is attributable to a specific, identifiable failure within its control system, Defendant shall present the information supporting this conclusion to the Professional Engineer during the consultation and site visit required in Paragraphs 20-21. If the Professional Engineer agrees with Defendant's conclusion, Defendant may request approval from EPA and WVDEP to limit the Work Plan required under Paragraph 25 to those measures identified in Paragraph 26 that relate to the identified cause of the failure in question by submitting a Modified Work Plan to EPA and WVDEP. The Modified Work Plan must be submitted to EPA and WVDEP within sixty (60)

days of the triggering event for approval. EPA and WVDEP shall approve, disapprove, or modify the Modified Work Plan within forty-five (45) days of receipt. EPA and WVDEP's determination shall be final unless Defendant invokes Dispute Resolution pursuant to Section IX.

28.     The Work Plan required by Paragraph 25 shall be submitted to EPA and WVDEP for approval within one hundred twenty (120) Days of engaging the Professional Engineer in accordance with the procedures identified in Paragraphs 53 through 57. The Work Plan shall include a schedule for implementation of the Projects set forth in the Work Plan. In its submission, Defendant must identify any Work Plan Project(s) that it believes are not necessary, feasible, and/or cost-effective and shall provide a complete explanation, including a discussion of each of the above factors, outlining its disagreement with the Professional Engineer's recommendations in the Work Plan. For any Work Plan project(s) which Defendant believes are not necessary, feasible, and/or cost-effective, Defendant shall provide its own alternative engineering control proposal(s).

29.     Defendant shall implement the projects in the approved Work Plan pursuant to the schedule submitted to and approved by EPA and WVDEP.

30.     Within sixty (60) Days after completion of the projects identified in the approved Work Plan, Defendant shall perform an opacity observation and shall comply with all of the procedures identified in Paragraphs 17 through 20 above.

31.     If Defendant fails to demonstrate compliance with the opacity standard in Paragraph 12 through the opacity observation in Paragraph 30, it shall repeat this process specified in Paragraphs 21 through 30 until it demonstrates compliance with the requirements of this Consent Decree.

32.     <u>Independent Third Party Verification:</u> Defendant shall retain, at its expense, a third party verifier ("Verifier") to conduct a verification of Defendant's compliance with the requirements of Paragraphs 14 through 17. Defendant shall require that the Verifier act independently and objectively when performing all activities related to assessing Defendant's compliance with this Consent Decree. Defendant shall provide the Verifier with full access to the Facility and provide or otherwise make available any necessary personnel, documents, and Facility health and safety training information to fully perform all verification activities.

33.     Within thirty (30) Days after the receipt of the final report of an opacity observation demonstrating compliance with the requirements of this Consent Decree under Paragraphs 17.c or 30, as applicable, Defendant shall submit the name of the proposed Verifier to EPA and WVDEP pursuant to the procedures specified in Paragraphs 33 through 35. Defendant shall certify that the Verifier meets each of the following conditions:

    a.     The Verifier shall be a licensed Professional Engineer with specific knowledge and expertise in industrial ventilation systems and control of pyrometallurgical processes;

    b.     The Verifier and its personnel have not conducted research, development, design, construction, financial, engineering, legal, consulting, nor any other advisory services for the Defendant within the last three (3) years. If the Verifier has conducted any of the above-described services for Defendant within the last three (3) years, Defendant's submission shall identify all services and/or work performed by the Verifier within the last three (3) years.

    c.     The Verifier was not involved in the development of the EPA and State

35

approved Work Plan, or any other requirement described in Paragraphs 14
through 30;

d.    The Verifier and its personnel will not provide any other
commercial, business, or voluntary services to the Defendant for a
period of at least three (3) years following the Verifier's submittal
of the Verification Report without EPA approval; and

e.    Defendant shall not provide future employment to any of the Verifier's
personnel who managed, conducted, or otherwise participated in the Third
Party Verification for a period of at least three (3) years following the
Verifier's submittal of its Verification Report without EPA approval.

34.    EPA, in consultation with WVDEP, will notify Defendant in writing whether it
approves of its proposed Verifier. Within fourteen (14) Days of EPA approval, Defendant shall
retain a Verifier approved by EPA to perform the verification activities as set forth in Paragraphs
36 and 37. Defendant shall ensure that all verification personnel who conduct or otherwise
participate in verification activities shall certify that they satisfy the conditions set forth in
Paragraph 33 before receiving any payment from Defendant.

35.    If EPA, after consultation with WVDEP, rejects the Verifier proposed by
Defendant, within twenty-one (21) Days of receipt of EPA's written notification, Defendant
shall submit to EPA and WVDEP the names and qualifications of two (2) or more additional
proposed Verifiers that meet the qualifications set forth in Paragraph 33. EPA will review the
additional Verifiers proposed by Defendant in accordance with Paragraph 34. If EPA, after
consultation with WVDEP, rejects all of the additional Verifiers proposed by Defendant, within
twenty-one (21) Days of receipt of EPA's written notification, the Parties agree to resolve the

36

selection of the Verifier through the Dispute Resolution process in Section IX (Dispute

Resolution). Nothing in this Paragraph precludes the United States or WVDEP from assessing

stipulated penalties for missed verification deadlines associated with the need to replace a

Verifier unless Defendant successfully asserts that the inability of the Verifier to perform the

verification activities as required was a Force Majeure event in accordance with Section VIII

(Force Majeure), prevails in Dispute Resolution, or demonstrates that no independent Verifiers

meeting the criteria set forth in Paragraph 33 were available to conduct the required work within

the required timeframe.

36.    No later than sixty (60) Days after the later of (i) completion of the Projects, the

Work Plan (if applicable) and the requirements described in Paragraphs 14 through 17, or

Paragraphs 21 through 30, as applicable, or (ii) EPA and WVDEP approval of the Verifier, the

Verifier shall concurrently submit a verification report ("Verification Report") to EPA, WVDEP,

and Defendant that meets the following requirements:

    a.    The Verification Report shall include:

        (1)    A summary of the Verifier's process for evaluating whether

Defendant has installed, calibrated, and is maintaining all capture

and control equipment required under Paragraphs 14 through 17

and, if applicable, the Work Plan required under Paragraph 29, and

has installed, calibrated, and is maintaining monitoring equipment

as described in Paragraph 15 (and conducting monitoring of all

parameters), including any obstacles encountered in the form of

lack of access to the Facility, necessary personnel or documents or

otherwise;

(2)    Detailed findings with respect to each of the elements described in Paragraph 36.a(1), including the basis for each finding and each area of concern identified;

(3)    Identification of all documents reviewed and names of all personnel interviewed in support of its findings and conclusions;

(4)    A certification by the Verifier that the evaluation was conducted independently and objectively and in accordance with Paragraphs 32 through 39 of this Consent Decree; and

(5)    A certification by the Verifier that it has remained in compliance with all of the conditions set forth in Paragraph 33.

b.    Defendant shall ensure that the Verifier does not share any draft of preliminary audit findings or reports with Defendant in any format including, but not limited to, electronic, paper, or verbal communications.

c.    Defendant shall ensure that the Verifier does not conduct post-evaluation oral or written communications with Defendant except to request additional verification-related data or information.

d.    Defendant shall ensure that the Verifier does not share its findings or conclusions with Defendant until the Verifier submits its Verification Report to EPA and WVDEP.

37.    Defendant shall ensure that its contract with the Verifier explicitly includes provisions for the following:

a.    The Verifier is retained to independently and objectively evaluate whether Defendant has completed all work required under this Consent Decree by

38

the schedule(s) approved by EPA and WVDEP. Such evaluation shall include verification that Defendant:

(1)     Has installed, calibrated, and is maintaining all capture and control equipment required by this Consent Decree;

(2)     Has installed, calibrated, and is maintaining monitoring equipment as described in Paragraph 15 (and is monitoring all parameters).

b.     By no later than sixty (60) Days after the later of (i) Defendant's completion of the projects and requirements described in Paragraphs 14 through 17, or Paragraphs 21 through 30, as applicable, or (ii) EPA and WVDEP approval of the selected Verifier, the Verifier shall submit a Verification Report concurrently to EPA, WVDEP, and Defendant containing a summary of its evaluation process, including any obstacles encountered in the form of lack of access to the Facility, necessary personnel or documents or otherwise; detailed findings, including the basis for each finding and each area of concern identified; conclusions based on such findings as to whether Defendant completed all work required by this Consent Decree, including requirements for flow meters, as described in Paragraph 15 of the Consent Decree; identification of all documents reviewed and the names of all personnel interviewed in support of its findings and conclusions; a certification by the Verifier that the evaluation was conducted independently and objectively and in accordance with the provisions of Paragraphs 32 through 37 of the Consent Decree; and a

39

certification by the Verifier that it has remained in compliance with all of the conditions set forth in Paragraph 33 of the Consent Decree, and will continue to adhere to the conditions of Paragraph 33 until three (3) years after the Verification Report is submitted.

c.   The Verifier shall not share any draft or preliminary audit findings or reports with Defendant in any format including, but not limited to, electronic, paper, or verbal communications.

d.   The Verifier shall not engage in any post-evaluation or written communications with Defendant except to request additional verification-related data or information.

e.   The Verifier shall not share its findings or conclusions with Defendant until after the Verifier submits its Verification Report to EPA and WVDEP.

f.   All verification personnel who conduct or otherwise participate in verification activities will be required to certify that they satisfy the conditions set forth in Paragraph 33 of this Consent Decree before receiving any payment from Defendant.

38.   Verifier shall submit a copy of the Verification Report to Defendant at the same time it submits the Verification Report to EPA and WVDEP. Within thirty (30) Days of receiving the Verification Report, Defendant shall submit to EPA and WVDEP a written response to the Verification Report which shall include (i) identification of any findings that Defendant disagrees with, including the basis for this disagreement and any supporting information, and (ii) where Defendant agrees with any deficiency findings, descriptions of

40

completed or proposed actions to correct deficiencies identified in the Verification Report, including the date(s) that such corrections occurred or are scheduled to occur.

39.     EPA and WVDEP shall review the Verification Report, Defendant's response (if any), and any other relevant information to determine Defendant's compliance with Paragraphs 14 through 17 and Paragraphs 21 through 30, if applicable. If EPA, after consultation with WVDEP, determines that Defendant is in violation of any requirement of this Consent Decree, Defendant shall be liable for stipulated penalties to the EPA and WVDEP, pursuant to Section VII (Stipulated Penalties). EPA and WVDEP's determination of compliance is subject to the provisions in Section IX (Dispute Resolution) of this Consent Decree.

40.     Parametric Monitoring After the Trial Period: Immediately upon establishing parameter values pursuant to Paragraph 17.a-17.c, as applicable, Defendant shall monitor the parameters in accordance with 40 C.F.R. § 63.1626(h). The data from the parameter values shall be monitored from the control room by personnel qualified and authorized to take necessary corrective action upon failure to maintain the parameter values within the limits established pursuant to Paragraph 17.a-17.c, as applicable, including, but not limited to, initiating a Root Cause Analysis pursuant to Paragraph 45.

41.     Defendant shall create quarterly reports of the monitoring data generated pursuant to Paragraph 40 and submit the reports to EPA and WVDEP on a quarterly basis by the end of the next month after each of the following dates: March 31st, June 30th, September 30th, and December 31st of each year that this Consent Decree is in effect. The report shall identify any failure to maintain the parameter values established pursuant to Paragraph 17 as well as corrective actions taken after the failure to maintain parameter values in order to minimize

41

excess emissions.

42.  Video Camera System:

    a.  Within sixty (60) Days of the Date of Lodging, Defendant shall install and maintain a video camera system that includes multiple video cameras that are aimed at the Shop Building and that record and send live video feeds to the Guard House to ensure any visible emissions are observed by personnel qualified and authorized to further evaluate for compliance with the applicable opacity rule.

    b.  The video camera system shall:

      (1)  Consist of two cameras permanently installed at the locations identified in Appendix B;

      (2)  Record all sides of the Shop Building, including the roof line, and all openings;

      (3)  Record in digital format at a rate of no less than 10 frames per second;

      (4)  Date and time stamp the recordings, and

      (5)  Be maintained consistent with the requirements of 40 C.F.R. § 63.8(c), as applicable to the type of device used.

    c.  On any date on which the video system documents visible emissions for greater than thirty (30) consecutive minutes, Defendant shall conduct visible emissions readings for the Shop Building in accordance with the procedures in its Title V Permit and EPA Method 9, 40 C.F.R. Part 60, Appendix A-4 ("Method 9") at least once on that date, for a minimum of

sixty (60) minutes as set forth below. Until October 20, 2018, the
observations shall continue for at least sixty (60) minutes; after October
20, 2018, the observations shall continue for a minimum of one furnace
process cycle. The opacity observation period shall include the next
tapping and pouring cycle that meets the criteria set forth in that method.
Readings shall be made on any date that a video camera documents visible
emissions from a Shop Building opening for greater than thirty (30)
consecutive minutes unless conditions do not meet the criteria set forth in
that method.

(1)     In the event that any Method 9 reading indicates opacity levels
        exceeding the applicable opacity limit, Defendant shall conduct
        Method 9 readings at least once every three (3) hours, until
        Method 9 readings indicate opacity levels that do not exceed the
        applicable opacity limit. The opacity observation period shall
        include the next tapping and pouring cycle. If Defendant does not
        conduct Method 9 readings at least every three (3) hours that meet
        the criteria set forth in that method, until Method 9 readings
        indicate opacity levels that do not exceed the applicable opacity
        limit, it shall be presumed that for the rest of the date opacity
        levels remained in excess of the applicable limit until Method 9
        readings taken over sixty (60) consecutive minutes or one furnace
        process cycle, as applicable, indicate opacity levels that do not
        exceed the applicable opacity limit.

43

(2)     In the event that a Method 9 reading indicates opacity levels in compliance with opacity limits, no further Method 9 readings need to be taken unless required by the Ferroalloys MACT, the West Virginia SIP, Defendant's Title V permit, or otherwise, or unless a video camera documents visible emissions from a Shop Building opening for greater than thirty (30) minutes on that date, in which instance Defendant shall conduct additional Method 9 readings of at least sixty (60) consecutive minutes or one furnace process cycle, as applicable.

(3)     Defendant shall generate a report for each Method 9 reading. The report shall include the operating conditions in the Shop Building including, but not limited to, which furnace(s) were operating, percent of electrical load for each furnace, which Casting Stations were used, and general weather conditions.

(4)     If the requirement to conduct a Method 9 reading is triggered by Subparagraphs (1) or (2) but conditions do not meet the criteria set forth in that method, Defendant shall generate a report identifying the conditions not met in Method 9, which furnace(s) were operating, percent of electrical load for each furnace, which Casting Stations were used, and general weather conditions.

d.     Defendant shall submit to EPA and WVDEP a quarterly report of its compiled Method 9 readings by the end of the next month after each of the following dates: March 31st, June 30th, September 30th, and

44

December 31st of each year that this Consent Decree is in effect. The quarterly report shall identify any violation(s) of the applicable opacity standard in Paragraph 12, the likely cause of such violation(s), corrective measure(s) taken to address the violation(s), and the effectiveness of such corrective measure(s).

e.   Defendant shall maintain recordings from the video camera system in a labeled and chronologically-ordered system.

f.   Defendant shall maintain recordings from the video camera system for at least three (3) rolling months and make recordings available to EPA and WVDEP upon request.

43.   Any credible evidence can be used to demonstrate noncompliance with the opacity limit set forth in Paragraph 12. *See Environmental Protection Agency Recent Posting of Broadly Applicable Alternative Test Methods*, 77 Fed. Reg. 8,865-02 (Feb. 15, 2012). The video camera readings required under Paragraph 42 are designed to provide notification to Defendant of possible opacity conditions and shall not constitute credible evidence for the purposes of this provision unless it is demonstrated that the reading satisfied all Method 9 criteria.

44.   If Defendant implements a digital camera opacity technique ("DCOT") system pursuant to the Ferroalloys MACT, 40 C.F.R. Part 63, Subpart XXX, effective June 30, 2015, as amended on January 18, 2017, Defendant may use the DCOT system to satisfy the Method 9 observation obligations of this Consent Decree.

45.   Root Cause Analysis: Defendant shall conduct a Root Cause Analysis when (a) the Facility exceeds one or more of the parameters established pursuant to Paragraph 17 for

45

volumetric flow rate for two (2) hours or more on a single Day, (b) the Facility exceeds one or more of the parameters established pursuant to Paragraph 17.c for control system fan motor amperes and capture system damper positions during two consecutive shifts, or (c) the Facility is not in compliance with the applicable opacity standard set forth in Paragraph 12. Defendant shall submit the Root Cause Analysis to EPA and WVDEP in accordance with Section XIII (Notices) within forty-five (45) Days of the commencement of such non-compliance. The Root Cause Analysis shall be submitted to EPA and WVDEP in accordance with the procedures identified in Paragraphs 53 through 57 and shall:

    a.    Set forth all significant contributing causes of the parameter exceedance or failure to meet the applicable opacity standard;

    b.    Provide an analysis of the remedial measures available to reduce the likelihood of a recurrence, including, but not limited to, corrective and preventative action(s) and/or other design, operation, process, and maintenances changes by the Facility; and

    c.    Include a recommendation of the remedial measure(s) to be implemented and a schedule for their implementation.

46.    If a Root Cause Analysis identifies alternative remedial measures to address the parameter exceedance or failure to meet the applicable opacity standard, the Root Cause Analysis shall discuss the probable effectiveness and cost of the alternative remedial measures.

47.    If the exceedance that triggers the Root Cause Analysis requirements of Paragraphs 45 and 46 also triggers the Work Plan requirements of Paragraphs 21 through 31, compliance with the Work Plan provisions shall be deemed to satisfy the Root Cause Analysis requirements.

48.    Operation of Other Furnaces: In the event that Defendant elects to operate more than one furnace during the time this Consent Decree is in effect, except as provided in Paragraph 14, Defendant shall inform EPA and WVDEP in writing sixty (60) Days prior to the startup of the second furnace. Defendant shall specify in its notification to EPA and WVDEP its plan to comply with each of the requirements of this Section V (Compliance Requirements) and this Consent Decree in accordance with the procedures specified in Paragraphs 53 through 57.

49.    All of the requirements of Section V (Compliance Requirements) and this Consent Decree shall apply to the Defendant's furnace(s) in Paragraph 48.

50.    Except as provided in Paragraphs 14 and 48 of this Consent Decree, Defendant shall not operate any furnace other than Furnace No. 5 without first completing any and all corrective actions at that furnace necessary to achieve compliance with the applicable opacity standards in effect at the time of the restart, including the standards set forth in this Consent Decree. Within sixty (60) Days of restarting operation of the furnace(s), Defendant shall conduct an opacity observation in accordance with the procedures specified in Paragraphs 17 through 20 of this Consent Decree for the controls at that furnace and, if the new controls affect the existing controls, on the affected existing controls. If the restart of the furnace occurs after June 30, 2017, the restart of the furnace is subject to all of the requirements of this Consent Decree as well as the requirements of the any other applicable laws and regulations, including but not limited to the amended Ferroalloys MACT, 40 C.F.R. Part 63 Subpart XXX, 40 C.F.R. Part 63, Subpart XXX, effective June 30, 2015, as amended on January 18, 2017.

51.    If the opacity observation conducted pursuant to Paragraph 50 demonstrates that the Facility is not in compliance with the requirements of this Consent Decree, Defendant shall

47

develop and implement a Work Plan for such furnace(s) as set forth in Paragraphs 21 through 31.

52.    Inspections: No later than thirty (30) Days after Defendant completes the opacity observation, as described in Paragraphs 17 through 20, Defendant must perform monthly inspections of the external elements of (a) the Exhaust Ventilation Systems to ensure that the hood locations have not been changed or obstructed because of contact with cranes or ladles, (b) the physical condition of hoods and ductwork to the control device, supply and exhaust, to determine if there are any openings or leaks in the ductwork, (c) the hoods and ductwork to determine if there are any flow constrictions in the hoods or the ductwork due to dents or accumulated dust, (d) the operational status of flow rate controllers (including but not limited to pressure sensors, dampers, and damper switches) to ensure they are operating correctly, (e) the fume seals, and (f) the video camera system to ensure the video cameras are securely fastened and not obstructed. Defendant must document all deficiencies, maintenance, and repairs performed, and shall submit a quarterly report to EPA and WVDEP by the end of the next month after each of the following dates: March 31st, June 30th, September 30th, and December 31st of each year that this Consent Decree is in effect documenting deficiencies, maintenance, and repairs performed in accordance with Section XIII (Notices).

53.    Approval of Deliverables: After review of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, EPA, after consultation with WVDEP, shall within forty-five (45) Days, in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission. EPA shall not unreasonably withhold its approval of any such submission.

48

54.     If the submission is approved pursuant to Paragraph 53(a), Defendant shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part pursuant to Paragraph 53(b) or (c), Defendant shall, upon written direction from EPA, after consultation with WVDEP, take all actions required by the approved plan, report, or other item pursuant to any specified conditions that EPA, after consultation with WVDEP, determines are technically severable from any disapproved portions, subject to Defendant's right to dispute only the specified conditions or the disapproved portions, under Section IX (Dispute Resolution). If EPA and/or WVDEP does not approve or disapprove a submission within the timeframe required by this Consent Decree or required by such a submission, Defendant shall implement the proposed action in accordance with the schedule and requirements of the plan, report, or other document as submitted, unless and until EPA and/or WVDEP responds or approves an alternate schedule.

55.     If the submission is disapproved in whole or in part pursuant to Paragraph 53(c) or (d), Defendant shall, within forty-five (45) Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. Defendant may invoke the Dispute Resolution procedures of Section IX for disapproved submittals. If the resubmission is approved in whole or in part, Defendant shall proceed in accordance with the preceding Paragraph.

56.     Any stipulated penalties applicable to the original submission, as provided in Section VII, shall accrue during the forty-five (45) Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part;

49

provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

57.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA after consultation with WVDEP may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs, or may themselves correct any deficiencies subject to Defendant's right to invoke Dispute Resolution and the right of EPA and WVDEP to seek stipulated penalties as provided in the preceding Paragraphs.

58.     Permits: Where any compliance obligation under this Section requires Defendant to obtain or modify a federal, state, or local permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals within thirty (30) Days. Defendant may seek relief under the provisions of Section VIII (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VI.  REPORTING REQUIREMENTS

59.     In addition to the reports specified in Section V (Compliance Requirements), Defendant shall submit the following reports:

a.      By the end of the next month after June 30th and December 31st of each year after the lodging of this Consent Decree, until termination of this Decree pursuant to Section XVIII, Defendant shall submit electronically a semi-annual report for the preceding six months that shall include, but not be limited to, the status of any

construction or compliance measures; completion of milestones; problems encountered or anticipated, together with implemented or proposed solutions; status of permit applications; operation and maintenance; and reports to state agencies.

      b.    The reports required to be submitted pursuant to Section V (Compliance Requirements) and Paragraph 59.a shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant shall notify the United States and WVDEP of such violation and its likely duration, in writing, within ten (10) working Days of the Day Defendant first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the report. Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within thirty (30) Days of the Day Defendant becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section VIII (Force Majeure).

      60.    The first report due under Section V (Compliance Requirements) and Paragraph 59 shall be no later than the end of the next month after June 30th, 2018. Defendant shall report "Not Applicable" for any Compliance Requirements not triggered during the reporting period.

      61.    Whenever any violation of this Consent Decree or the applicable Title V Permit

or any other event affecting Defendant's performance under this Decree, or the performance of its Facility, may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA and WVDEP orally and by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Defendant first knew of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

62.     All reports required by this Section and Section V (Compliance Requirements) shall be submitted to the persons designated in Section XIII (Notices).

63.     Each report submitted by Defendant under this Section and Section V (Compliance Requirements) shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

64.     This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

65.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Clean Air Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

66.     Any information provided pursuant to this Consent Decree may be used by the United States and/or WVDEP in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VII. STIPULATED PENALTIES

67.     Defendant shall be liable for stipulated penalties to the United States and WVDEP for violations of this Consent Decree as specified below, unless excused under Section VIII (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any Work Plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

68.     Late Payment of Civil Penalty: If Defendant fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $5,000 per Day for each Day that the payment is late.

69.     Emissions Limits: The following stipulated penalties shall accrue for each violation of the opacity emission limit specified in Paragraph 12, including each violation of the opacity emission limit specified in Paragraph 12 discovered during the opacity observations required pursuant to Paragraphs 17, 30, and/or 42:

| Penalty Per Violation | Number of Violations |
|---|---|
| $2000 | 1st through 10th Violation |
| $3000 | 11th through 20th Violation |
| $4500 | 21st Violation and beyond |

70.     Monitoring: The following stipulated penalties shall accrue per violation per Day

53

for each violation of any requirement of the installation, operation, monitoring and/or recordkeeping requirements of Paragraphs 40, and/or the Video Camera System Requirements of Paragraph 42:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th Day |
| $1500 | 15th through 30th Day |
| $2500 | 31st Day and beyond |

71.     Compliance Milestones:

a.     The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in Subparagraph 71.b:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th Day |
| $1500 | 15th through 30th Day |
| $2500 | 31st Day and beyond |

b.     These stipulated penalties shall apply to the following (including failure to comply with any scheduling requirements):

(1)     Failure to complete the Projects specified in Paragraph 14 according to the timeframes specified in this Consent Decree, and/or failure to shut down operations by August 26, 2018;

(2)     Failure to comply with the Trial Period requirements specified in Paragraph 15;

(3)     Failure to submit to EPA and WVDEP the report required by

54

Paragraph 16;

(4)     Failure to establish parameter values as required by Paragraph 17;

(5)     Failure to submit the Work Plan, if required by Paragraph 27;

(6)     Failure to complete the work under the Work Plan as required by Paragraph 29;

(7)     Failure to comply with the requirements of the independent third party verification process required by Paragraphs 32 through 39;

(8)     Failure to perform the opacity observations required by Paragraph 17, and/or Paragraph 30, as applicable;

(9)     Failure to conduct a Root Cause Analysis as required by Paragraph 45; and

(10)    Failure to operate within the parameter values established pursuant to Paragraph 17.

72.     <u>Reporting Requirements</u>: The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of Section V (Compliance Requirements) and/or Section VI (Reporting Requirements):

| <u>Penalty Per Violation Per Day</u> | <u>Period of Noncompliance</u> |
|---|---|
| $500 | 1st through 14th Day |
| $750 | 15th through 30th Day |
| $1000 | 31st Day and beyond |

73.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue

55

to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

74.    Defendant shall pay stipulated penalties to the United States and WVDEP within thirty (30) Days of a written demand by either Plaintiff. Defendant shall pay fifty (50) percent of the total stipulated penalty amount due to the United States and fifty (50) percent to WVDEP. The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff.

75.    Either Plaintiff may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

76.    Stipulated penalties shall continue to accrue as provided in Paragraph 73, during any Dispute Resolution, but need not be paid until the following:

a.    If the dispute is resolved by agreement or by a decision of EPA or WVDEP that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States or WVDEP within thirty (30) Days of the effective date of the agreement or the receipt of EPA's or WVDEP's decision or order.

b.    If the dispute is appealed to the Court and the United States or WVDEP prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

c.    If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

56

      d.    Defendant's compliance with Plaintiffs' demanded corrective action does not waive or render moot Defendant's ability to challenge either the corrective action itself or the stipulated penalties assessed for the alleged failure to perform that action in a timely or correct manner.

77.    <u>Obligations Prior to the Effective Date:</u> Upon the Effective Date, the stipulated penalty provisions of this Decree shall be retroactively enforceable with regard to any and all requirements of Section V (Compliance Requirements) that have occurred prior to the Effective Date, provided that stipulated penalties that may have accrued prior to the Effective Date may not be collected unless and until this Consent Decree is entered by the Court.

78.    Defendant shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 9, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid. Defendant shall pay stipulated penalties owing to WVDEP in the manner set forth and with the confirmation notices required by Paragraph 11, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

79.    If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or WVDEP from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

80.    Subject to the provisions of Section XI (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to

any other rights, remedies, or sanctions available to the United States (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt) for Defendant's violation of this Consent Decree or applicable law. Where a violation of this Consent Decree is also a violation of the Ferroalloys MACT, Defendant shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation.

## VIII. FORCE MAJEURE

81. "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation. The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

82. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice orally or by electronic or facsimile transmission to EPA and WVDEP, within seventy-two (72) hours of when Defendant first knew that the event might cause a delay (or seven (7) days after the conclusion of any natural disaster or terrorism-related emergency event). Within seven (7) Days thereafter (or fourteen (14) Days after the conclusion of any natural disaster or terrorism-related emergency event), Defendant shall provide in writing to EPA

58

and WVDEP an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

83.     If EPA, after a reasonable opportunity for review and comment by WVDEP, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by WVDEP, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

84.     If EPA, after a reasonable opportunity for review and comment by WVDEP, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event,

EPA will notify Defendant in writing of its decision.

85.     If Defendant elects to invoke the dispute resolution procedures set forth in Section IX (Dispute Resolution), it shall do so no later than fifteen (15) Days after receipt of EPA's notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 81 and 82. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## IX.  DISPUTE RESOLUTION

86.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

87.     Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed twenty (20) Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless,

within forty-five (45) Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

88.    Formal Dispute Resolution. Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

89.    The United States shall serve its Statement of Position within forty-five (45) Days of receipt of Defendant's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

90.    Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIII (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

91.    The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court. Defendant may file a reply memorandum, to the extent

61

permitted by the Local Rules.

92.    Standard of Review

a.    <u>Disputes Concerning Matters Accorded Record Review.</u> Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 88 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b.    <u>Other Disputes.</u> Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 88, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree and better further the objectives of the Consent Decree.

93.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 76. If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VII (Stipulated Penalties).

## X. INFORMATION COLLECTION AND RETENTION

94. The United States, WVDEP, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

      a.     Monitor the progress of activities required under this Consent Decree;

      b.     Verify any data or information submitted to the United States or WVDEP in accordance with the terms of this Consent Decree;

      c.     Obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

      d.     Obtain documentary evidence, including photographs and similar data; and

      e.     Assess Defendant's compliance with this Consent Decree, the Ferroalloys MACT, the West Virginia SIP, Defendant's Title V Permit, and the CAA.

95. Upon request, Defendant shall provide EPA and WVDEP or their authorized representatives, splits of any samples taken by Defendant. Upon request, EPA and WVDEP shall provide Defendant splits of any samples taken by EPA or WVDEP.

96. Until five years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that demonstrate Defendant's performance or nonperformance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or

procedures. At any time during this information-retention period, upon request by the United States or WVDEP, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

97.     At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States and WVDEP at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or WVDEP, Defendant shall deliver any such documents, records, or other information to EPA or WVDEP. Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant asserts such a privilege, unless otherwise agreed to in writing by the Parties, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendant. However, no documents, records, or other information required to be created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

98.     Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

99.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or WVDEP pursuant to applicable

64

federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of

Defendant to maintain documents, records, or other information imposed by applicable federal or

state laws, regulations, or permits

## XI.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

100.    This Consent Decree resolves the civil claims of the United States and WVDEP

for the violations alleged in the Complaint filed in this action through the Date of Lodging.

101.    The United States and WVDEP reserve all legal and equitable remedies

available to enforce the provisions of this Consent Decree, except as expressly stated in

Paragraph 100. This Consent Decree shall not be construed to limit the rights of the

United States or WVDEP to obtain penalties or injunctive relief under the Act or

implementing regulations, or under other federal or state laws, regulations, or permit

conditions, except as expressly specified in Paragraph 100. The United States and

WVDEP further reserve all legal and equitable remedies to address any imminent and

substantial endangerment to the public health or welfare or the environment arising at, or

posed by, Defendant's Facility, whether related to the violations addressed in this Consent

Decree or otherwise.

102.    Plaintiffs reserve the right to impose more stringent emission limitations on

Defendant's sources under any CAA or West Virginia statutory or regulatory requirements

which may become applicable.

103.    In any subsequent administrative or judicial proceeding initiated by the United

States or WVDEP for injunctive relief, civil penalties, other appropriate relief relating to the

Facility, Defendant shall not assert, and may not maintain, any defense or claim based upon the

principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-

splitting, or other defenses based upon any contention that the claims raised by the United States or WVDEP in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 100.

104.    This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and WVDEP do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, 42 U.S.C. § 7401, *et seq.*, or with any other provisions of federal, state, or local laws, regulations, or permits.

105.    This Consent Decree does not limit or affect the rights of Defendant or of the United States or WVDEP against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

106.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XII. COSTS

107.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and WVDEP shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any

stipulated penalties due but not paid by Defendant.

XIII.     NOTICES

108.    Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States by email:         eescdcopy.enrd@usdoj.gov
                                          Re: DJ # 90-5-2-1-10991

As to the United States by mail:          EES Case Management Unit
                                          Environment and Natural Resources Division
                                          U.S. Department of Justice
                                          P.O. Box 7611
                                          Washington, D.C.  20044-7611
                                          Re: DJ # 90-5-2-1-10991

As to EPA:                                Office of Air Enforcement & Compliance Assurance (3AP20)
                                          Air Protection Division
                                          U.S. Environmental Protection Agency Region III
                                          1650 Arch Street (3AP00)
                                          Philadelphia, PA 19103

                                          and

                                          James Hagedorn (3AP20)
                                          Air Protection Division
                                          U.S. Environmental Protection Agency Region III
                                          1650 Arch Street (3AP00)
                                          Philadelphia, PA 19103
                                          E-mail: hagedorn.james@epa.gov
                                          and

                                          Jennifer Abramson (3RC50)
                                          Office of Regional Counsel
                                          U.S. Environmental Protection Agency Region III
                                          1650 Arch Street (3AP00)
                                          Philadelphia, PA 19103
                                          E-mail: abramson.jennifer@epa.gov

67

As to WVDEP:                    Director, Division of Air Quality
                                West Virginia Department of Environmental Protection
                                601 57th St.
                                Charleston, WV 25304

As to the United States Attorney for the Southern District of West Virginia:

                                Fred B. Westfall, Jr.
                                Assistant United States Attorney
                                WV State Bar No. 3992
                                P.O. Box 1713
                                Charleston, WV 25301

As to Defendant:                Adam Thatcher
                                Plant Manager
                                Felman Production, LLC
                                4422 Graham Station Road
                                Letart, WV 25253

                                Daniela Rost
                                General Counsel
                                Georgian American Alloys, Inc. 200
                                S. Biscayne Blvd
                                Suite 5500
                                Miami, FL 33131

109.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

110.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XIV.    EFFECTIVE DATE

111.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Defendant

hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective

Date. In the event the United States withdraws or withholds consent to this Consent Decree

before entry, or the Court declines to enter the Consent Decree, then the preceding requirement

to perform duties scheduled to occur before the Effective Date shall terminate.

## XV. CERTIFICATION

112.     Defendant hereby certifies, to the best of its knowledge and belief, after

thorough inquiry, (a) that it has submitted to the United States financial information that fairly,

accurately, and materially sets forth its financial circumstances; (b) that those circumstances

have not materially changed between January 2017 and the date that Defendant signed this

Consent Decree; and (c) that it does not have any insurance policies that may cover any payment

of a civil penalty relating to this matter.

## XVI.     RETENTION OF JURISDICTION

113.     The Court shall retain jurisdiction over this case until termination of this

Consent Decree, for the purpose of resolving disputes arising under this Decree or entering

orders modifying this Decree, pursuant to Sections IX and XVII, or effectuating or enforcing

compliance with the terms of this Decree.

## XVII.     MODIFICATION

114.     The terms of this Consent Decree, including any attached appendices, may

be modified only by a subsequent written agreement signed by all the Parties. Where the

modification constitutes a material change to this Decree, it shall be effective only upon approval

by the Court.

115.     Any disputes concerning modification of this Decree shall be resolved

pursuant to Section IX (Dispute Resolution), provided, however, that, instead of the burden of

proof provided by Paragraph 92, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Fed. R. Civ. P. 60(b).

## XVIII.    TERMINATION

116.    After Defendant has completed the requirements of Section V (Compliance Requirements), has thereafter maintained satisfactory compliance with this Consent Decree and Defendant's Title V Permit for a period of three (3) years, has complied with all other requirements of this Consent Decree, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States and WVDEP a Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

117.    Following receipt by the United States and WVDEP of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States, after consultation with WVDEP, agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

118.    If the United States, after consultation with WVDEP, does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section IX. However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until ninety (90) Days after service of its Request for Termination.

## XIX.    PUBLIC PARTICIPATION

119.    This Consent Decree shall be lodged with the Court for a period of not

70

less than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.
The United States reserves the right to withdraw or withhold its consent if the comments
regarding the Consent Decree disclose facts or considerations indicating that the Consent
Decree is inappropriate, improper, or inadequate. Defendant consents to entry of this Consent
Decree without further notice and agrees not to withdraw from or oppose entry of this Consent
Decree by the Court or to challenge any provision of the Decree, unless the United States has
notified Defendant in writing that it no longer supports entry of the Decree.

## XX. SIGNATORIES/SERVICE

120.    Each undersigned representative of Defendant and the Director of the
WVDEP DAQ and Counsel for the West Virginia Department of Environmental Protection and
the United States Attorney for the Southern District of West Virginia and the Assistant Attorney
General for the Environment and Natural Resources Division of the Department of Justice
certifies that he or she is fully authorized to enter into the terms and conditions of this Consent
Decree and to execute and legally bind the Party he or she represents to this document.

121.    This Consent Decree may be signed in counterparts, and its validity shall
not be challenged on that basis. Defendant agrees to accept service of process by mail with
respect to all matters arising under or relating to this Consent Decree and to waive the formal
service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any
applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXI.    INTEGRATION

122.    This Consent Decree constitutes the final, complete, and exclusive
agreement and understanding among the Parties with respect to the settlement embodied in
the Decree and supersedes all prior agreements and understandings, whether oral or written,

concerning the settlement embodied herein. Other than deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

XXII.     FINAL JUDGMENT

123.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State, and Defendant. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

Dated and entered this 8th day of AUG., 2018

UNITED STATES DISTRICT JUDGE

Signature Page for *United States of America v. Felman Production, LLC* Consent Decree

FOR THE UNITED STATES DEPARTMENT OF JUSTICE:

Respectfully submitted,

_(illegible) 2018_
Date

NATHANIEL DOUGLAS
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division

_6/6/2018_
Date

ALEXANDRA B. SHERERTZ
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division

73

Signature Page for *United States of America v. Felman Production, LLC* Consent Decree

FOR THE UNITED STATES DEPARTMENT OF JUSTICE:

> Respectfully submitted,

> MICHAEL B. STUART
> United States Attorney

> FRED B. WESTFALL: 3992
> Assistant United States Attorney
> United States Attorney's Office
> P.O. Box 1713
> Charleston, WV  25301
> Phone: 304-345-2200
> Fax: 304-347-5443
> E-mail: fred.westfall@usdoj.gov
> *Counsel for United States*

Signature Page for *United States of America v. Felman Production, LLC* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:


Respectfully submitted,


COSMO SERVIDIO
Regional Administrator
U.S. Environmental Protection Agency, Region III


MARY B. COE
Regional Counsel
U.S. Environmental Protection Agency, Region III


JENNIFER ABRAMSON
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency, Region III
(3RC50)
1650 Arch Street
Philadelphia, PA 19103-2029

75

Signature Page for *United States of America v. Felman Production, LLC* Consent Decree

FOR THE STATE OF WEST VIRGINIA

Respectfully submitted,

JASON WANDLING
State of West Virginia
Department of Environmental Protection
Office of Legal Services

With approval of:

William F. Durham
Director, Division of Air Quality
Department of Environmental Protection

Signature Page for *United States of America v. Felman Production, LLC* Consent Decree

FOR FELMAN PRODUCTION, LLC:


Date                              Mordechai Korf
                                  President and CEO
                                  Georgian American Alloys, Inc.

77

# APPENDIX A



GF-60372-4

Scanned by CamScanner



# APPENDIX B

